cJ25 2626

Palumbo



### IN THE DISTRICT COURT OF OKLAHOMA COUNTY
### STATE OF OKLAHOMA

**BILLY & LACY HURSH,**

*Plaintiffs,*

v.

**(1) STATE FARM FIRE AND CASUALTY COMPANY;**

**(2) MARK D. WELTY;** and

**(3) MARK D. WELTY INSURANCE AGENCY, INC.,**

*Defendants.*

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

APR 1 7 2025

RICK WARREN
COURT CLERK

128

CASE NO. _____

## CJ - 2025 - 2 6 2 6

---

## PETITION

---

EXHIBIT
6

## I.    INTRODUCTION

1.    This Petition alleges a systematic and pervasive Scheme on the part of Defendants (a) State Farm Fire and Casualty Company ("State Farm") and (b) State Farm's captive Agent Mark D. Welty and Mark D. Welty Insurance Agency, Inc. (referred to collectively as "Agent").[1] By and through their Scheme, Defendants have caused substantial harm to Plaintiffs.

2.    State Farm is a household name—it holds itself out as a premier provider of insurance products under the slogan "Like a good neighbor, State Farm is there." State Farm's marketing lures insureds with customer-focused messaging designed to build trust among a diverse target audience. State Farm's website brags about "keeping promises" and that its success "is built on a foundation of shared values—quality service and relationships, integrity and financial strength."

3.    Despite its hollow "good neighbor" promises, Defendants employ a systematic and pervasive Scheme throughout Oklahoma, whereby State Farm wrongfully denies its insureds' claims for damage to their covered property caused by wind and/or hail. State Farm's denials of wind and hailstorm claims are unreasonable, lack true justification, and are pre-determined. Defendants employ the Scheme intentionally, knowingly, and purposefully for profit and do so in bad faith.

4.    Defendants' wind and hailstorm scheme (the "Scheme") operates as follows:

a.    State Farm's captive agents (including Agent) market, sell, procure, and bind[2] State Farm insurance coverage to the insured at the insured's behest to cover the

---

[1] This Petition refers to both State Farm and Agent collectively as "Defendants."

[2] Under Oklahoma law, each annual issuance of the policy at issue involves each of these acts, whether it be the inception of coverage in the first instance or the subsequent renewal thereof. Therefore, even an agent who renews coverage initially procured by another agent engages in these acts.

insured's home. In doing so, State Farm's agent expressly and/or impliedly represents (i) the property to be insured meets State Farm's underwriting requirements for the coverage bound, and (ii) the replacement cost value (and resultant coverage limit) State Farm's agent calculated for the insured is accurate—each of which could only be true if the agent physically inspected the property and verified its condition. This inspection practically never occurs, yet State Farm's agents market, sell, procure, and bind State Farm coverage nonetheless. This act inherently represents to the insured in each instance that the property in question qualifies for the insurance to be bound and meets the underwriting guidelines governing such coverage. Yet the agent lacks all practical bases to make such an inherent representation.

      b.    Moreover, State Farm's agents know about the Scheme, yet they wholly fail to disclose the Scheme to the insured or advise the insured of any of the Scheme's realities, all of which operate to negate the coverage the policy purports to afford the insured. This includes the fact that State Farm uses a very narrow and limited definition of what constitutes hail damage that is not contained in the insured's policy. State Farm uses this definition to dictate whether an insured is entitled to payment under the policy upon the filing of a valid wind and/or hailstorm claim, yet it can be found nowhere in the policy. State Farm agents further the Scheme by refusing to disclose this material information of this narrow and limited definition of hail damage when marketing, selling, procuring, and/or binding State Farm coverage. State Farm agents know about yet fail to disclose State Farm's other bad faith claims handling tactics inherent to the Scheme, which would be material information to an insured when purchasing an insurance policy. State Farm's

3

agents fail to disclose this (and other) material information about State Farm's Scheme in violation of duties owed to the insured.

      c.     On the Agent's certification that the property meets State Farm's underwriting guidelines, State Farm issues a policy purporting to convey coverage for the insured's home. State Farm, through both the policy itself and its captive agents, expressly and/or impliedly, represents the policy covers loss arising from a wind or hailstorm. The policy language does not define or otherwise limit hail damage coverage outside of the policy monetary coverage limits and the loss triggering clause: "accidental direct physical loss."

      d.     The insured incurs a covered loss to the insured property arising from wind or hailstorm and timely files a claim.

      e.     State Farm denies the claim as part of its Scheme. It does so using an array of (i) undisclosed definitions and coverage limitations that are entirely absent from the four corners of the policy, and (ii) bad faith claims handling tactics that are rigged against the insured. It denies the claim vis-a vis the roof either outright or, in many cases, by depressing the amount it agrees to pay below the policy deductible, thereby avoiding payment. In limited instances, it may pay for certain property damage that exceeds the deductible. But in each instance, State Farm does whatever it can to avoid replacing the roof; it manipulates its damage estimate to ignore patent wind and or hail damage to the insured property, ostensibly blaming it on some non-covered cause of loss.

      f.     The Scheme is a byproduct of State Farm's Hail Focus Initiative, which set out to reduce State Farm's indemnity losses on wind and hailstorm claims—most critically, total roof replacements. Non-confidential documents in the public record, such as Exhibit

4

6 attached to the August 14, 2023 response pleading in CJ-2021-1741,[3] evidence the Scheme in action. A State Farm adjuster testified under oath to how the agent's determination of the condition of the roof at inception or renewal and subsequent denial for "wear and tear" or pre-existing damage are essential in State Farm's denial of full roof replacements. The captive agent is a critical player in the Scheme via its assessment of the property's conformity to State Farm's underwriting guidelines, inspection (or lack thereof) at policy inception and renewal, determination of eligibility for replacement cost, determination of the amount of such replacement cost, and the assessment of the condition of the roof and premises. The State Farm adjuster admitted under oath as follows:

> everyone on our team did not have any authority anymore to total roofs because **we were paying for too many roof claims** … when I was told that it is not hail or it's not new hail, to call it wear and tear to deny a claim, I felt – I felt bad … I legitimately felt like there was some damage from hail, from new hail that I felt that the roof should be totaled, that I was told to deny the whole thing, and that – that was difficult.

g.     Discovery from State Farm filed in the public record reveals that State Farm captive agents are well aware of how hail claims are being adjusted. In Exhibit 6 to the June 14, 2023 pleading, a State Farm captive agent, David Hoffhines, sent the following email:

> I understand that you are not able to find hail on the date my insured has cell phone pics on? Can we discuss this please?? How do I tell my client that the hail damage marks that were uploaded to the file from contractor are invisible to claims reps and supervisors?? I know the growing trend is for SF to deny hail claims, I'm just curious how do I word this??

h.     When subjected to the Scheme, an insured has no choice but to file suit to recover benefits State Farm owes under the policy. State Farm's treatment of Plaintiffs

---

[3]Available at https://www.oscn.net/dockets/GetCaseInformation.aspx?db=oklahoma&number=CJ-2021-1741&cmid=3968060.

(including bad faith claims handling tactics and material misrepresentations and/or omissions by State Farm and State Farm agents) exemplifies this Scheme in action, as the Petition sets forth in Section III, below.

## II.     PARTIES

5.      **Plaintiffs Billy and Lacy Hursh** ("Plaintiffs") own the Insured Property, which is located in Tulsa County, Oklahoma. Plaintiffs entered into a contract of insurance with State Farm to provide replacement cost coverage for the Insured Property, dwelling insurance policy no. 36CLH1074 (the "Policy") through Agent's offices. The Policy was in force and effect at the time of the loss in question. The Insured Property was damaged on or about October 4, 2023, May 21, 2024, and potentially dates thereafter. Plaintiffs timely filed claims for indemnity under the Policy for damage to the Insured Property (referred to collectively as the "Claim," No. 36-64D8-27T and No. 36-70R1-64Z).

6.      **Defendant State Farm Fire and Casualty Company** ("State Farm") is a foreign insurer licensed to do business in the State of Oklahoma. State Farm may be found and served via its statutory service agent the Oklahoma Insurance Department in Oklahoma County, Oklahoma.

7.      **Defendants Mark D. Welty and Mark D. Welty Insurance Agency, Inc.** (collectively, "Agent") own and operate a captive State Farm agency in Tulsa County, Oklahoma. Agent was at all relevant times an agent and/or ostensible agent of Defendant State Farm. Agent may be served with process through the registered agent, Mark D. Welty, at 5324 S Memorial Drive, C-3, Tulsa, Oklahoma 74145.

8.      Agent is a properly joined defendant to this action. *See Pruitt v. State Farm Fire & Cas. Co.*, 5:25-cv-00043-D (W.D. Okla. April 7, 2025) (DeGiusti, C.D.J.); *Norman v. State Farm,* Remand Order ECF No. 16,CIV-24-1132-R (W.D. Okla. Jan. 30, 2025) (Russell, D.J.); *Oliver v. State Farm*, Remand Order ECF No. 12, CIV-24-789-SLP (W.D. Okla. Feb. 11, 2025) (Palk, D.J.);

6

*Bartholomew v. State Farm*, 2022 WL 22879674 (W.D. Okla. Dec. 16, 2022) (Jones, D.J.); *Bean v. State Farm*, (N.D. Okla. June 26, 2024) (Cartwright, D.J.); *Burleson v. State Farm*, 2024 WL 3842579 (W.D. Okla. Aug. 16, 2024) (Russell, D.J.); *Champion v. State Farm*, 2023 WL 11944492 (W.D. Okla. Dec. 29, 2023) (Wyrick, D.J.); *Christy v. State Farm*, 2023 WL 2933312 (W.D. Okla. Apr. 13, 2023) (Russell, D.J.); *Ervin v. Herb Weaver Ins. Agency, Inc.*, 2022 WL 22839581 (W.D. Okla. Dec. 28, 2022) (Palk, D.J.); *Harris v. State Farm*, 2024 WL 1957315 (W.D. Okla. May 3, 2024) (DeGiusti, C.D.J); *Jackson v. State Farm*, 647 F.Supp.3d 1195 (W.D. Okla. 2022) (DeGiusti, C.D.J); *Jessop v. State Farm*, 2024 WL 3400543 (E.D. Okla. July 12, 2024) (Melgren, D.J.); *Killingsworth v. State Farm*, (N.D. Okla. April 21, 2023) (Kern, D.J.); *Kyger v. State Farm*, 649 F. Supp. 3d 1200 (W.D. Okla. 2022) (DeGiusti, C.D.J.); *McDow v. State Farm*, 2022 WL 17960457 (W.D. Okla. Dec. 27, 2022) (Friot, D.J.); *Nelson v. State Farm*, 647 F. Supp. 3d 1189 (W.D. Okla. 2022) (DeGiusti, C.D.J.); *Phillips v. State Farm*, 2023 WL 336142 (W.D. Okla. Jan. 20, 2023) (DeGiusti, C.D.J); *Pruitt v. State Farm Fire & Cas. Co.*, 5:25-cv-00043-D (W.D. Okla. April 7, 2025) (DeGiusti, C.D.J.); *Ross v. State Farm*, 2024 WL 1092540 (W.D. Okla. Mar. 13, 2024) (Dishman, D.J.); *Sexton v. State Farm*, 2023 WL 11917022 (W.D. Okla. Jan. 5, 2023) (Jones, D.J.); *Shira v. State Farm*, 2023 WL 4624701 (W.D. Okla. July 19, 2023) (Russell, D.J.); *Stacy v. State Farm Fire & Cas. Co.*, 2023 WL 11915451 (W.D. Okla. Dec. 29, 2023) (Wyrick, D.J.); *Stayton v. State Farm*, (N.D. Okla. April 20, 2023) (Kern, D.J.); *Whitby v. State Farm*, 2023 WL 11763365 (N.D. Okla. Aug. 21, 2023) (Frizzell, D.J.); *see also Martin v. Allstate Vehicle & Property Ins. Co.*, 2024 WL 3510301 (W.D. Okla. July 23, 2024) (Palk, D.J.); *Parkison v. Hanover Ins. Co., et al.*, 2023 WL 8452436 (W.D. Okla. Nov. 20, 2023) (Friot, D.J.); *Wedin v. Allstate*, 2023 WL 6806995 (N.D. Okla. Oct. 16, 2023) (Eagan,

D.J.). As Agent is a citizen of the forum-state, removal of this action by any Defendant would be improper, unreasonable, and frivolous under 28 U.S.C. § 1447.

9.      Venue is proper pursuant to 12 O.S. § 137.

### III.      FACTUAL BACKGROUND

10.     State Farm has preordained the denial of its insured's valid claims for hail damage through various undisclosed tactics which are weaponized against first-party insureds like Plaintiffs. This decision reflects simple greed: maximizing profits for State Farm at the expense of its insureds. State Farm's Hail Focus initiative established the goal of reducing its indemnity payments by denying full roof replacements to policyholders like the Plaintiffs on valid wind and hail claims. State Farm utilizes biased third-party adjusters and/or engineers who further implement the Scheme outlined herein by consistently writing reports and estimates to deny full roof replacements on valid wind and hail claims.

11.     To achieve this end, State Farm knowingly developed and implemented its enterprise-wide, pervasive, and systematic Scheme. State Farm implements the Scheme throughout Oklahoma using a variety of bad faith tactics and employees at every level of State Farm. State Farm even employs biased third-party companies on its behalf to rubber-stamp and approve of its bad faith tactics in furtherance of the Scheme. State Farm utilizes biased third-party adjusters and/or engineers who further implement the Scheme outlined herein by consistently writing reports and estimates to deny full roof replacements on valid wind and hail claims.

12.     This case exemplifies the Scheme in action. State Farm's treatment of Plaintiffs and the Claim demonstrates each step in the Scheme leading to State Farm's intended outcome.

### A.     State Farm's Captive Agents Anchor the Scheme.

13.     In each instance, State Farm's Scheme begins with its captive agents (including Agent), who sell a State Farm form insurance policy to the insured at the insured's behest.

8

1.    **State Farm Agent's Duties in Procuring Coverage.**

14.    State Farm captive agents solicit and market what they tout as a replacement cost homeowners insurance coverage to prospective insureds. State Farm uses the same policy to issue homeowners coverage in Oklahoma—while the amount of coverage (and premiums charged therefor) differ from insured to insured, the scope of coverage is in large part materially the same for all insureds subjected to the Scheme.

15.    State Farm considers its agents to be the first line of its underwriting division. State Farm's Agent plays a crucial role in the sale of State Farm's insurance policy to the insured. This role creates key legal duties, which State Farm's Agent owes to the insured:[4]

a.    State Farm's agents must use reasonable care, skill, and diligence to procure and/or renew coverage as the insured requested that meets the insured's stated needs;

b.    State Farm's agents who undertake the calculation of replacement cost for the insured must use reasonable care, skill, and diligence to do so; and

c.    When State Farm's agents speak, they owe a duty to do so accurately and truthfully.

d.    State Farm agents have a duty to speak and to fully disclose all material information to an insured about State Farm's bad faith claims handling tactics, its reliance on undisclosed definitions and standards outside of the Policy, internal and external

---

[4] Under Oklahoma law, a duty to speak may arise from a partial disclosure. *Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp.*, 24 F.3d 1190, 1195 (10th Cir. 1994) (the law imposes a duty to speak from a partial disclosure because "the speaker is under a duty to say nothing or to tell the whole truth" (citation and internal quotation marks omitted)); *Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350,1353-54 (Okla. 1988) ("Although a party may keep absolute silence and violate no rule of equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to disclose the whole truth."); *see also Ervin v. Herb Weaver Ins. Agency, Inc.*, 2022 WL 22839581 (W.D. Okla. Dec. 28, 2022) (Palk, D.J.)

complaints about State Farm's handling of wind and hailstorm claims, and other material information any insured would deem reasonable in making a purchasing decision.

16.    Industry standards, as well as agents' legal duty of reasonable skill, care, and diligence in the procurement and/or renewal of insurance, require State Farm's agents to act in accordance with the training and contractual requirements State Farm imposes upon them. These requirements and training exist to ensure policyholders receive the coverage they request and Agent binds coverage in accordance with their representations to the insured and State Farm's internal guidelines.

17.    Agent markets as much on Agent's website, where he sets forth his accreditations under The American College of Financial Services' Chartered Financial Consultant ("ChFC") and Chartered Life Underwriter ("CLU") programs as well as The Institute's Chartered Property Casualty Underwriter ("CPCU") program. Agent's CPCU designation is a professional designation identifying an individual who has satisfactorily completed eight national examinations covering various phases of property-casualty ("P&C") insurance and met industry experience and ethical requirements—what The Institute touts as "the leadership standard in risk management and insurance." It is designed to demonstrate Agent's expertise in the field, and he markets himself with that designation. Further:

> **Homeowners Insurance**
>
> Protect your largest investment from unexpected events life may throw your way with State Farm® Homeowners Insurance in Tulsa, OK. So, what's covered?[1] Your home insurance ensures you can repair or replace your home, as well as the items you value. Personal property is covered even if you're on vacation, running errands or holding items in storage. More homeowners choose State Farm as their home insurance company over any other insurer.[2]
>
> Mark Welty in Tulsa, OK will help you get started after you complete a homeowners insurance online quote. It's fast and easy!

18.     State Farm agents ***should*** meet their duties by *inter alia* performing an in-person inspection of the Insured Property prior to the inception of coverage and routinely thereafter to verify the condition and attributes of the Insured Property for the purposes of (a) the agent's accurate calculation of replacement cost and (b) the agent's accurate representation that the Insured Property qualifies for coverage under State Farm's guidelines, rules, and criteria. Since each renewal is a new sale and contract, the agent should maintain a baseline of the property's condition throughout the insurance relationship with the insured. Indeed, not all homes automatically qualify for State Farm's homeowners' policies—only those which meet its internal underwriting rules and thus constitute a "good risk" for State Farm to insure.

19.     The policy is a contract—one that obligates State Farm to indemnify its insured upon the occurrence of a covered loss. State Farm's issuance of an insurance policy rests on the agent's certification of the property's qualifications under State Farm underwriting guidelines—a critical representation to both State Farm and the insured: namely, that the property identified in the policy declarations meets the criteria for the coverage prescribed at the time of inception and/or renewal for which the agent is responsible.[6] The agent further represents, at the very least impliedly

---

[5] https://www.statefarm.com/agent/us/ok/tulsa/mark-welty-b05sd1ys000

[6] This must be true, for the issuance of coverage upon a property that does not qualify at the time would constitute an illusory coverage violation, as well as a violation of State Farm's own underwriting rules.

through the act of selling, procuring and/or renewing, and binding coverage (and, in certain instances, expressly) that no condition, pre-existing damage, deterioration, wear-and-tear, or other defect will operate to negate the property's eligibility for full coverage under the policy in the event of a loss.

20.     State Farm's agent must inspect the property to determine this eligibility for coverage under State Farm's internal underwriting requirements. There is no other way for the agent to gather the information the agent needs to accurately relay to State Farm (and the insured) whether the property rightfully meets the criteria for coverage.

21.     Most captive State Farm agents have binding authority. That means they instruct State Farm to issue coverage. In doing so, the agent represents to both State Farm and the insured that the property meets certain criteria and is eligible for coverage. This representation is repeated each time the policy renews, such that the agent represents the property's eligibility (and, thereby, the absence of any condition that would negate that eligibility), each policy year upon renewal. By virtue of the act of doing so, the agent certifies and represents to both State Farm and the insured that the property meets State Farm's underwriting criteria and is therefore eligible for coverage. This representation is repeated each time the policy renews, such that the agent represents the property's eligibility (and, thereby, the absence of any condition that would negate that eligibility), each policy year upon renewal.

22.     In the event State Farm's agent finds the property fails to quality for replacement cost coverage (as defined by State Farm's underwriting rules) at any point in the insurance relationship (*e.g.*, the roof is too old, too worn, in poor condition, or otherwise affected by pre-existing conditions), State Farm's agent owes an independent duty to report the same to both the

12

insured and to State Farm. This should result in reduction, denial, or cancellation of coverage. Of course, this determination would first require a physical inspection of the roof.

23.     Ultimately, State Farm's agent markets, sells, procures and/or renews, and binds coverage for the property—whether for the first time or by means of renewal—on behalf of State Farm. State Farm then issues a resultant homeowners insurance policy upon the agent's certification that all binding (and, therefore, underwriting) rules, guidelines, and criteria are met. Remarkably, State Farm's agents almost never perform or acquire an in-person inspection of the property to be insured. This means they represent the property's eligibility to both State Farm and the insured recklessly and blindly, without ever verifying whether that representation is true, in almost every instance of the Scheme.

24.     This consistent misrepresentation is a necessary furtherance of the Scheme in each instance; State Farm's agents cannot bind a policy without first representing the property qualifies for coverage. Agent thus relies on the same training to make the same or similar representations that each Insured Property is eligible for the coverage sought under the same underwriting guidelines. This uniformity allows State Farm to effectuate its Scheme with consistency.

**2.      Agent's Treatment Exemplifies the Scheme.**

25.     Agent's treatment of Plaintiffs exemplifies the Scheme and shows it in action:

a.      Plaintiffs contacted Agent to procure full replacement cost homeowners insurance coverage from State Farm. Plaintiffs requested Agent obtain a replacement cost policy that would provide coverage for the Insured Property in the event of a loss.

b.      To that end, Plaintiffs expressly and/or inherently disclosed concerns and insurance needs to Agent. Above all, given Oklahoma's extreme weather, Agent is aware that the Plaintiffs needs coverage under a policy that would fully replace the Insured Property's roof in the event of a loss, without exclusion of any weather-related losses.

Agent assured Plaintiffs that the Policy provided the broadest form of coverage available and was an outstanding value for his insurance dollars.

      c.     By virtue of the act of marketing, selling, procuring, and binding coverage under the Policy (without any limitation for wind or hailstorm damage), Agent independently established, calculated, and set the Policy's replacement cost value and resultant policy coverage limits. Neither Agent nor State Farm required or otherwise asked Plaintiffs to calculate or request a specific amount of coverage for the Insured Property. Instead, Agent took on that responsibility and thereby incurred the duty to do so accurately and with the requisite skill, knowledge, and expertise. Given Agent's touted expertise, the only way he could have possibly done so, in a manner commensurate with these duties, is by means of an inspection of the home to ascertain its condition and qualities.

      d.     By virtue of the act of marketing, selling, procuring, and binding coverage under the Policy (without limitation), Agent inherently conveyed that such coverage limit was accurate, correct, commensurate with actual reconstruction costs, and represented 100% of the Insured Property's insurance to value. Agent thereby inherently represented to Plaintiffs that the Insured Property met State Farm's underwriting guidelines, rules, and criteria and qualified for the coverage Agent bound.

      e.     Both Agent and State Farm thereby either knew or should have known of any material defect, pre-existing damage, or other condition(s) that would exclude the Insured Property from replacement cost coverage and failed to disclose it.

      f.     Both Agent and State Farm knew State Farm purposefully uses hidden definitions of wind- and/or hailstorm damage to deny claims but failed to disclose these to insureds in the Policy or at any point prior to claims adjustment.

26.    In furtherance of the Scheme, Agent committed the following strategic and material *omissions*:

a.    On information and belief, neither Agent nor State Farm ever inspected the Insured Property or procured such an inspection from a third party.

b.    On information and belief, neither Agent nor State Farm ever verified the Insured Property's condition, characteristics, attributes, etc.—whether at Policy inception or upon each subsequent annual renewal of the Policy.

c.    Regardless of whether an inspection occurred, neither Agent nor State Farm ever disclosed to Plaintiffs that the Insured Property was ineligible under State Farm's underwriting rules for the requested replacement cost coverage for any reason.

d.    Regardless of whether an inspection occurred, neither Agent nor State Farm ever advised Plaintiffs that the Insured Property had any defect, pre-existing damage, or other conditions that would exclude it under State Farm's underwriting rules from replacement cost coverage.[7]

e.    Neither Agent nor State Farm ever advised Plaintiffs of State Farm's Scheme, including but not limited to State Farm's internal and clandestine definitions of "hail damage," "wear and tear," "granular loss," "functional damage," etc.

f.    Neither Agent nor State Farm required or otherwise asked Plaintiffs to calculate or request a specific amount of coverage for the Insured Property—rather, Agent assumed this duty and thereby assumed the duty to do so accurately, with requisite skill, knowledge, and expertise, and in a way commensurate with these duties. These obligations

---

[7] As explained above, had Agent identified any such condition, Agent would have been required to report the same to both Plaintiffs and State Farm.

necessitated a physical inspection of the Insured Property, which would have disclosed any defect, pre-existing damage, or coverage-negating condition.

g.      Neither Agent nor State Farm disclosed to Plaintiffs that the value Agent calculated for the Insured Property and resultant coverage limits did not in fact represent more than 100% insurance to value because State Farm had already pre-ordained the denial of any claim for roof damage.

h.      Neither Agent nor State Farm disclosed to Plaintiffs the existence of the Scheme, the Wind-Hail Focus Initiative, or any aspects thereof.

27.      Nevertheless, and under the cover of Agent's strategic and material omissions, Agent marketed, sold, procured, and bound coverage (whether at inception or renewal) without limitation. State Farm issued the Policy. Agent, by virtue of these acts, represented that Plaintiffs were covered under the Policy for all fortuitous losses, including all weather-related damage.

28.      Given Agent's purported expertise and specialized knowledge of insurance policies, Plaintiffs reasonably relied on Agent's representations.

**B.      State Farm Uses a the Same Policy to Perpetuate the Scheme.**

29.      State Farm uses the same replacement cost policy to issue homeowners insurance coverage throughout Oklahoma.[8] State Farm's policy is integral to the Scheme: the criteria, limitations, exclusions, and other tactics State Farm employs in adjusting windstorm, hailstorm,

---

[8] This Petition does not allege that the *terms* of State Farm's policy or the rates State Farm charges therefore are unlawful. The Petition does not invoke (and further disclaims) any invocation of the filed-rate doctrine. Rather, the Petition alleges conduct on State Farm's part (as well as that of other Defendants) that does not square with the four corners of State Farm's policy—that Defendants use hidden and undisclosed claims handling criteria, limitations, exclusions, and other tactics that are wholly absent from the terms of the policy. This renders Defendants' *conduct* unlawful. Therefore, any argument that this Petition invokes the primary jurisdiction of the Oklahoma Department of Insurance, or the Commissioner, is a misled end-run around bad faith jurisprudence and tort law in Oklahoma.

and tornado claims, which are at issue in this case, are wholly absent from the four corners of State Farm's policy. This is true for each Scheme victim—in no instance does State Farm disclose these hidden tactics in a policy to an insured.

30.    State Farm and its captive agents (like Agent) represent the policy to be a replacement cost policy. The coverage limit for the property insured under the policy is keyed to its replacement cost value, such that the policy should afford an amount of coverage that represents (at least) the full amount needed to replace the Insured Property in the event of a loss. State Farm, through its captive agents (like Agent), voluntarily assumes the responsibility of calculating both the replacement cost value and the resultant coverage limit for the insured.

31.    State Farm's replacement cost policy functions like an "all risk" policy: that is, if the policy does not expressly exclude a loss, then the policy should afford coverage for the loss pursuant to the loss clause. Thus, State Farm's form policy affords coverage for the property in question for damage resulting from hail because hail damage is not expressly excluded from coverage. The form policy speaks only to "accidental direct physical loss" therefrom, with no other limitation or definition disclosed.

> **COVERAGE A – DWELLING**
>
> *We* will pay for accidental direct physical loss to the property described in Coverage A, unless the loss is excluded or limited in SECTION I – LOSSES NOT IN-SURED or otherwise excluded or limited in this policy. However, loss does not include and *we* will not pay for, any *diminution in value*.

32.    The policy does not define, limit, or otherwise mitigate coverage for tornado, wind and/or hail-storm damage outside of "accidental direct physical loss" therefrom. The policy does not provide any limitations on how or when such coverage will apply to a roof. It does not specify, condition, define, or limit that coverage in any way, *e.g.*, minimum windspeeds, the type of roof damage, a minimum number of hail strikes per square foot, a minimum size of hail, etc. Rather,

all of these *very real* limitations exist in State Farm claims handling procedures, which lie obscured beyond the view and understanding of the insured until the insured files a claim and confronts the Scheme.

33.    On its face, State Farm's policy merely purports to provide the insured the broadest form of coverage available today. State Farm's policy cover page (and, therefore, the Policy's cover page) states as follows:



### C.    State Farm Employs an Array of Bad Fath Claims Handling Tactics to Perpetuate the Scheme.

34.    State Farm's Scheme then turns on a series of bad-faith claims handling tactics, which help State Farm justify its denial of valid claims. These tactics, along with State Farm's agent's complicity (described above), are all part of State Farm's Hail Focus initiative—an enterprise-wide program State Farm implemented through its property and casualty claims department to reduce its indemnity losses related to roof damage from wind, hail, and tornado. The Hail Focus initiative included an array of claims handling practices that are wholly absent from the policy and any disclosures made to the insured (until, of course, State Farm ambushes the insured with a denial). These practices include, but are not limited to, the following:

35.    **State Farm employs a narrow and limited definition (as well as restrictive claims handling protocols) for hail damage.** This allows State Farm adjusters to deny claims even when their loss inspection clearly shows hail damage to the insured roof. State Farm's narrow and limited definition is absent from the four corners of the policy and hidden from the insured until State Farm uses it to deny a valid claim. State Farm's captive agents (including Agent here) are fully aware of the narrow and limited definition, this critical disclosure is concealed, and State Farm's insureds are wholly unaware of coverage limitation until they suffer a loss, file a claim, and receive a denial. It is only when the insured becomes the latest victim of State Farm's Scheme that the insured learns of State Farm's internal limitations to its coverage regarding hail damage. This is precisely what happened to Plaintiffs.

36.    **State Farm's adjusters misattribute damage to non-covered causes of loss.** State Farm's adjusters find damage to the insured property but attribute that damage to a non-covered cause of loss—most commonly, "wear and tear," "pre-existing damage," or "manufacturer defect." With regard to roof shingles, State Farm often misclassifies shingle damage as "granular loss." This finding flies in the face of Defendants' representations and/or material omissions, which are inherent to the act of procuring, binding, and renewing coverage. In many instances, this is stated plainly on State Farm's denial letter. In other instances, the adjuster simply fails to acknowledge the damage at all. Yet there is, indeed, patent wind- and/or hailstorm damage, such that the insured was compelled to file the claim. The adjuster simply fails to record it as a covered cause of loss—thereby implying that the damage was caused by some other, non-covered cause. Critically, Defendants expressly and/or impliedly represent that the Insured Property qualifies for the coverage bound by virtue of the act of binding the coverage. Thus, if the roof suffered from a manufacturer defect, pre-existing damage, or substantial wear and tear, the roof may not qualify

for coverage (whether at inception or annual renewal). This should be detected by the Agent's inspection and inform some change in coverage. These defects cannot accrue or appear by fiat in the mere months between the most recent policy renewal and the date of loss. It is, at best, duplicitous for Defendants to, on one hand, tell the insured that the property fully qualifies under State Farm's underwriting rules for the coverage bound and then, with the other, tell the insured that it in fact did not. This is exemplary ambush claims-handling and *prima facie* bad faith.

37.    **State Farm adjusters misstate the date of loss.** If the insured is unable to pinpoint the exact date of loss, State Farm's adjuster uses the opportunity to further the Scheme and justify State Farm's pre-ordained denial of the claim. In these instances, State Farm adjusters review the Accuweather data and *choose* a date of loss that either (a) falls outside its hidden one-year limitation or (b) shows insufficient hail occurred to constitute a covered claim under its clandestine rules. If the insured pinpoints a date certain for the date of loss, State Farm may still use Accuweather to justify its wrongful denial of the insured's hail damage claim.

38.    In addition, State Farm subjects its insureds to arbitrary limits on the time to file claims, manipulates damage findings to ensure losses fall under the policy deductible, and even employs its hand-chosen engineering firms (who are dependent on State Farm for business) to drum up sham reports that rubber-stamp its adjusters' misrepresentations.

39.    Each of these aforementioned bad-faith claims handling tactics perpetuates the Scheme and allows State Farm to deny valid property insurance claims. State Farm trains its claims handling personnel to implement these tactics. State Farm trains its captive agents (like Agent) to market, sell, bind, and/or renew coverage in a way that allows the Scheme to carry forward undetected.

**D.    Defendants Subjected Plaintiffs to the Scheme.**

40.    The manner in which State Farm handled the Claim illustrates State Farm's Scheme and clearly demonstrates State Farm's bad faith:

a.    The Insured Property was damaged during a significant wind and hailstorm which occurred in the Tulsa area on or about October 4, 2023 and potentially dates thereafter. The Insured Property sustained substantial wind and hail damage across the entirety of the roof, and to its gutters, and to its exterior windows and walls.

b.    Plaintiffs properly and timely submitted the Claim to State Farm for the storm damage.

c.    State Farm's adjuster first inspected the Insured Property on March 12, 2024. The adjuster conducted an inadequate inspection and failed to recognize the vast majority of damage to the Insured Property. State Farm adjuster, J.R. Phillips, wrote: *"No hail damage found to shingles of any slopes. No storm created opening found to any slopes of the roof. Granule loss, deterioration found to all slopes due to age and improper ventilation. Areas marked by roofer for consideration are not consistent with hail impacts. Roof appears to be in fair overall condition. Pea size hail dents found to soft metal vents which are more prone to damage by smaller hailstones"*.

d.    Adjuster Phillips engages in the pattern and practice of using almost identical language to deny full roof replacement claims by other State Farm insureds. He blamed the patent hail damage on a non-covered cause of loss in furtherance of the Scheme.

e.    In furtherance of the Scheme, State Farm used the inspection report to prepare a damage estimate of $1,446.87 for the cost to repair the alleged damages to the Insured Property. Specifically, State Farm refused to acknowledge the comprehensive damage to the entire Insured Property, including the need for a full roof replacement.

21

f.     On March 12, 2024, State Farm sent a letter to Plaintiffs denying the Claim on the grounds that the Insured Property had displayed signs of wear, tear, or deterioration.

g.     Plaintiffs appealed to State Farm to adjudicate the Claim in a fair manner. State Farm denied Plaintiffs' appeal.

h.     On or about May 21, 2024, Insured Property was damaged by another significant wind and hailstorm.

i.     Plaintiffs properly and timely filed a second claim with State Farm.

j.     Randy James of ROKE Roofing & Construction, a reputable and trustworthy contractor, conducted an inspection of Insured Property on May 29, 2024. Mr. James determined that Insured Property had suffered serious storm damage and that a full roof replacement was required.

k.     State Farm again inspected the Insured Property. During this inspection, State Farm determined that there was storm damage to the Insured Property but that the damage was minor.

l.     On July 29, 2024, State Farm sent a letter to Plaintiffs stating that while Insured Property did sustain storm damage, the cost of the damages remained below the Policy deductible. Thus, State Farm informed the Plaintiffs that no payment would be forthcoming.

m.     In fall 2024, Plaintiffs were forced to borrow against the equity in the Insured Property to cover the cost of a full roof replacement. The cost of the full roof replacement was in excess of $22,000.

n.     State Farm's estimates were inadequate, shoddy, and significantly lower than that of the reputable roofers and contractors to inspect the Property.

22

o.     By virtue of the Scheme, State Farm manipulated its loss findings to avoid paying Plaintiffs all amounts owed under the Policy, including a full roof replacement.

## IV.    FRAUDULENT CONCEALMENT

41.    All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

42.    At all relevant times, Defendants concealed material facts about State Farm's Scheme from Plaintiffs. This concealment protected and perpetuated the Scheme, such that Plaintiffs had no way of ascertaining the Scheme or the accrual of any cause of action against Defendants.

43.    The Scheme is an artifice, which State Farm designed to be hidden from its insureds' discovery. To wit, the inherent nature of State Farm's "good neighbor" promises—the duty of good faith and fair dealing State Farm owes its insureds—makes the artifice appear reliable. Insureds of ordinary prudence have no means of discovering the Scheme or their right to pursue recovery under the law.

44.    Defendants' fraudulent concealment tolls the running of any applicable statute of limitations.

## V.    COUNTS

### COUNT ONE: BREACH OF CONTRACT
#### *Against Defendant State Farm*

45.    All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

46.    Plaintiffs entered into the Policy with State Farm to provide them with homeowner's insurance for the Insured Property. The Policy was in full force and effect at all material times hereto.

23

47.     Plaintiffs provided proper and timely notice to State Farm of the Claim for damage arising from wind and/or hail, which caused significant damage to the Insured Property.

48.     The Policy coverage includes all fortuitous losses—which necessarily includes damage sustained by wind and/or hail. The Policy language does not define, distinguish, or limit wind and/or hail damage in any fashion.

49.     Plaintiffs complied in all material ways with the terms and conditions of the Policy.

50.     State Farm breached its contractual obligations under the terms and conditions of Policy by failing to pay Plaintiffs all benefits owed under the terms and conditions of the Policy and for wrongfully underpaying and denying portions of the Claim.

51.     Consistent with State Farm's pervasive, state-wide fraudulent Scheme described in detail throughout this Petition, State Farm actively, intentionally, and fraudulently concealed its Scheme to deny and/or underpay valid hail damage claims from Plaintiffs. This concealment is an inherent and important aspect of State Farm's Scheme; as State Farm knew its Scheme would work only if it was kept secret.

52.     As a result of State Farm's breach of contract and other wrongful conduct, Plaintiffs incurred damages.

### COUNT II: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### ("Bad Faith")
### *Against Defendant State Farm*

53.     All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

54.     At all relevant times hereto, State Farm owed Plaintiffs a duty of good faith and fair dealing.

24

55.    State Farm knowingly, intentionally, purposefully, wrongfully, and repeatedly breached its duty to deal fairly and in good faith by engaging in at least the following acts and omissions:

a.    knowingly engaging in a pattern and practice of

    i.    denial-oriented investigations and claims-handling practices;

    ii.    arbitrary and capricious claims handling;

    iii.    denying and or underpaying indemnity payments owed to its first-party insureds on valid hail claims, including Plaintiff;

    iv.    withholding pertinent benefits, coverages, and other provisions due to Plaintiffs under the terms and conditions of the Policy in violation of the Unfair Claims Settlement Practices Act, 36 O.S. §§1250.1-1250.16;

    v.    limiting and/or denying rights inherent to Plaintiff;

    vi.    recklessly disregarding said rights;

    vii.    forcing Plaintiffs to retain counsel to recover insurance benefits owed under the terms and conditions of the Policy;

    viii.    manipulating claims to ensure damages fall below the policy deductible;

    ix.    and ignoring covered hail and windstorm damage;

    x.    engaging in the pattern and practice of denying full roof replacement claims by asserting pre-existing damages and faulty installation without a pre-inception property inspection and/or without

reasonably updated knowledge of the pre-loss condition of the subject property;

xi.  implementing the Hail Focus initiative with the goal of reducing indemnity payments and deny full roof replacements to policyholders like Plaintiffs on valid wind and hail claims;

xii.  utilizing biased third-party adjusters and/or engineers who further implement the Scheme outlined herein by consistently writing reports and estimates to deny full roof replacements on valid wind and hail claims;

b.  knowingly and purposely failing to

i.  inspect the Insured Property prior to inception of the coverage and/or maintain current information as to the condition of the Insured Property prior to the loss;

ii.  notify Plaintiffs, both prior to and at the inception and renewal of the Policy, of any pre-existing damage and other conditions that, if a claim were made, would limit coverage;

iii.  communicate all coverages and benefits applicable to the Claim;

iv.  perform a proper, timely, fair, and objective investigation of the Claim;

v.  pay the full and fair amount for the hail damage sustained to the Insured Property in accordance with the Policy's terms and conditions;

vi.   base its denial of the Claim on a valid, accurate, and reasonable grounds;

vii.  disclose the Scheme to Plaintiff; and

viii. disclose State Farm's lack of compliance with its own underwriting guidelines, policies, and procedures in denying coverage to Plaintiffs.

56.    State Farm's conduct, as described above, constitutes bad faith and is a material breach of the terms and conditions of the Policy and its underlying insurance contract between the parties. State Farm has no reasonable basis in its refusal to recognize and pay Plaintiffs the agreed replacement cost as per the Policy for damages caused by the wind and hail damage to the Insured Property.

57.    As a consequence of State Farm's breach of the duty of good faith and fair dealing, Plaintiffs sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering that naturally results from an insurance failure.

58.    State Farm's conduct was intentional, willful, malicious, and/or in reckless disregard of the rights of others. State Farm's actions during the handling of the Claim demonstrate it acted intentionally, and with malice and, breached its duty to deal fairly and in good faith. State Farm's actions were consistent with an overall collective corporate goal of increasing profits through the systematic underpayment and denial of claims and is sufficiently egregious in nature so as to warrant the imposition of punitive damages. State Farm's Scheme demonstrates a "pattern" theory of bad-faith conduct, liability for which is cognizable under Oklahoma law. *See* 12 Okla. Stat. § 2406; *Vining v. Enter. Fin. Group*, 148 F.3d 1206, 1218 (10th Cir. 1998) (where plaintiff

sought to prove insured's pattern and practice of bad faith conduct, evidence regarding other insureds was relevant to show defendant "acted in this case under Federal Rule of Evidence 406 (habit)"); *see also Metzger v. Am. Fid. Assur. Co.*, 2007 WL 4342082, at *1 (W.D. Okla. Dec. 7, 2007); *Markham v. National States Ins. Co.*, 122 Fed. Appx. 392 (10th Cir. 2004) (evidence of nation-wide rescission practice supported bad faith); *Barnes v. Okla. Farm Bur. Mut. Ins. Co.*, 2000 OK 55, 11 P.3d 162, 170 ("*insurer's unreasonable treatment of Barnes was not an isolated incident, but the same or similar tactic was used by insurer repeatedly with other insureds*"; awarding actual and punitive damages); *Copeland v. Tela Corp.*, 2003 OK CIV APP 98, ¶ 3, 79 P.3d 1128 (confirming no abuse of discretion in allowing evidence of habit evidence under 12 O.S. § 2406 to show pattern and practice conduct.); *Jones v. Farmers Ins. Co., Inc.*, 2012 WL 12863976 (W.D. Okla) (court holds that similar roof denial claims are relevant to bad faith claim to show a pattern and practice of denying damage on roof claims).

59.    State Farm enjoyed increased financial benefits and ill-gotten gains as a direct result of the wrongful conduct described above herein, which resulted in the injury to Plaintiffs.

### COUNT III: NEGLIGENT PROCUREMENT OF INSURANCE
#### *Against Agent*

60.    All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

61.    At all material times hereto, Agent acted as State Farm's agent and/or employee. State Farm is thereby vicariously liable for the Agent's conduct.

62.    In procuring the Policy, Agent had a duty to:

   a.    use reasonable care, skill, and diligence to procure coverage as the insured requested that meets the insured's stated needs;

28

b. use reasonable care, skill, and diligence in undertaking the calculation of replacement cost for the insured;

c. speak accurately and truthfully by informing Plaintiffs of all coverages, advising Plaintiffs of the benefits, risks, limitations and exclusions thereof, and perform a reasonable inspection of the Insured Property prior to procuring the replacement cost coverage and thereafter upon renewal to ensure no changes to the Policy were necessary or required; and

d. Disclose all material facts with respect to the Scheme as outlined within this Petition.

63. Agent breached Agent's duty owed to Plaintiffs by:

a. Knowingly and purposefully procuring and renewing

    i. illusory coverage (in that all fortuitous losses are not covered under the Policy);

    ii. coverage deviating substantially and materially from that which Plaintiffs requested;

    iii. a Policy that did not accurately reflect the replacement cost of the Insured Property (*i.e.*, an amount that was 100% insurance to value as represented);

    iv. a Policy that, as written, did not provide coverage to fully restore the Insured Property back to its pre-loss condition;

b. Failing to

    i. follow and abide by State Farm's underwriting policies/guidelines;

    ii. perform all necessary inspections of the Insured Property;

      iii.    confirm the accuracy of the pre-filled information provided by State Farm's replacement cost estimating tool;

      iv.    disclose pre-existing damage to the Insured Property;

      v.    verify whether its inherent representation to State Farm and Plaintiffs that the Insured Property (including the roof) was in good condition was accurate;

      vi.    procure and renew a policy that provided the requested coverage for all fortuitous losses; and

      vii.    disclose all material facts of the Scheme as outlined within this Petition.

64.    Plaintiffs relied on Agent's representations and omissions to his substantial detriment.

65.    As a result of Defendants' conduct, Plaintiffs sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering.

66.    Defendants' conduct was intentional, willful, malicious and in reckless disregard of the rights of others and is sufficiently egregious in nature so as to warrant the imposition of punitive damages. Defendants acted intentionally, and with malice and, breached duties owed to Plaintiffs. Defendants' actions were consistent with their overall collective corporate goal of increasing profits through the systematic underpayment and denial of claims.

## COUNT IV: CONSTRUCTIVE FRAUD AND NEGLIGENT MISREPRESENTATION
### Against All Defendants

67.    All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

68.     Defendants owed Plaintiffs a legal and/or equitable duty to disclose all material facts that may arise out of their relationship as insurer and insured. *Croslin v. Enerlex, Inc.*, 2013 OK 34, ¶17, 308 P.3d 1041.

69.     The concealment of a material fact which substantially affects another person constitutes fraud. *Patel v. OMH Medical Center, Inc.*, 1999 OK 33, ¶ 34; *Sutton v. David Stanley Chevrolet*, 2020 OK 87, 475 P.3d 847. Fraudulent representations may consist of half-truths calculated to deceive, and a representation literally true is actionable if used to create an impression substantially false. *Sutton*, 475 P.3d at 15. Where the peculiar circumstances give rise to a duty on the part of one of the parties to a contract **to disclose material facts and the party remains silent to his or her benefit and to the other party's detriment**, the failure to speak constitutes fraud. *Id.* (citing *Croslin*, ¶17) (emphasis added).

70.     "[A] variety of facts and circumstances [] will give rise to a duty to disclose material facts." The *Sutton* Court reiterated that it has "consistently found the existence of the requisite circumstances, *i.e.*, that which is necessary to create a duty to disclose, when the offending party created a false impression concerning material facts that was relied upon by the other party to his detriment and to the benefit of the offending party." *Id.* at 15.

71.     A negligent or innocent misrepresentation or concealment for constructive fraud occurs when one who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. Negligent misrepresentation can also be based on a material omission. *See Lopez v. Rollins*, 2013 OK CIV APP 43, 303 P.3d 911; *Sutton v. David*

31

*Stanley Chevrolet*, 2020 OK 87; *Stroud v. Arthur Andersen & Co.*, 2001 OK 76, 37 P.3d 783;
*Ragland v. Shattuck Nat'l Bank*, 36 F.3d 983, 992 (10th Cir. 1994) (applying Oklahoma law).

72.    Defendants owed specific duties to Plaintiffs. These duties are encompassed in
State Farm's duty of good faith and fair dealing owed to its insureds, as well as specific duties
Agent owed Plaintiff—a duty to exercise reasonable diligence and skill in obtaining and accurately
notifying of the nature and character of the insurance procured, the duty in undertaking the
calculation of replacement cost for the insured to use reasonable care, skill, and diligence to do so,
the duty to speak accurately and truthfully, and the duty to disclose all material facts relating to
the Scheme as outlined within this Petition.

73.    Defendants breached this duty by misrepresenting, concealing, or omitting
pertinent material facts from Plaintiffs, including (but not limited to) the following:

    a.    Defendants misrepresented the Insured Property met all underwriting
requirements, that all property inspections had occurred, and that the replacement cost
values it calculated were accurate and commensurate with reconstruction costs such that
the coverage would fully restore, replace and/or repair the Insured Property (including its
roof) in the event of a loss by a covered event.

    b.    Defendants misrepresented that the Insured Property (and, specifically, its
roof) was eligible for the comprehensive full replacement coverage (rather than ACV);

    c.    Defendants failed to disclose that pre-existing issues with the Insured
Property would either prevent issuance of the replacement cost coverage or limit coverage
for any damage during the Policy period;

    d.    Agent misrepresented the procurement of the comprehensive coverage
Plaintiffs requested;

e.    Defendants misrepresented that the Policy covered all fortuitous losses and that weather-related damage (even cosmetic)—big or small—was fully covered under the Policy;

f.    Defendants failed to disclose all material information to an insured about State Farm's bad faith claims handling tactics, its reliance on undisclosed definitions and standards outside of the Policy, internal and external complaints about State Farm's handling of wind and hailstorm claims, and other material information any insured would deem reasonable in making a purchasing decision.

g.    Defendants failed to disclose to Plaintiffs any of the above misrepresentations and/or omissions, any facts underlying these misrepresentations, or any material facts regarding the Scheme;

74.    Nevertheless, Defendants sold and renewed illusory replacement cost insurance coverage to Plaintiffs knowing such statement was untrue.

75.    As a result of both State Farm and Agent's breach of duty, each gained an advantage by misleading Plaintiffs to substantial detriment and prejudice. These breaches of duty induced Plaintiffs to accept, purchase, and renew the State Farm replacement cost policy.

76.    State Farm and Agent's misrepresentations constitute constructive fraud.

77.    At all relevant times, Agent was State Farm's employee and/or agent.

78.    As a result of the Defendants' constructive fraud, Plaintiffs sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering.

79.     Defendants' conduct was intentional, willful, malicious, and in reckless disregard of the rights of others, and/or was grossly negligent, and is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, this Court should enter judgment on behalf of Plaintiffs against all Defendants for:

(a)     Actual damages in an amount in excess of $75,000.00;

(b)     Punitive damages under Oklahoma law;

(c)     Disgorgement of the increased financial benefits derived by any and/or all of the Defendants as a direct result of the Defendants' wrongful conduct; and

(d)     Prejudgment interest, costs, and attorneys' fees.

Respectfully submitted,

*Blake Sonne*

Reggie N. Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
Blake Sonne, OBA No. 20341
Hannah Whitten, OBA No. 35261
John S. Sanders, OBA No. 34990
Jake Denne, OBA No. 35097

**WHITTEN BURRAGE**
512 North Broadway Avenue, Suite 300
Oklahoma City, OK 73102
Office:        405.516.7800
Facsimile:    405.516.7859
rwhitten@whittenburragelaw.com
mburrage@whittenburragelaw.com
bsonne@whittenburragelaw.com
hwhitten@whittenburragelaw.com
jsanders@whittenburragelaw.com
jdenne@whittenburragelaw.com

-and-

34

Patrick F. Collogan, OBA # 30529
**BIBY LAW FIRM**
6305 E. 120th Ct., Suite F
Tulsa, OK 74137
918-574-8458---Telephone
888-572-8263---Facsimile
pat@bibylaw.com
**ATTORNEYS FOR PLAINTIFF**

*ATTORNEYS' LIEN CLAIMED*
*JURY TRIAL DEMANDED*