

*1061279570*

CJ25 1860 -

Ma.

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

MID-DEL GROUP HOME, INC.; and
JOEL BAIN,

          Plaintiffs,

vs.

(1) PHILADELPHIA INDEMNITY
INSURANCE COMPANY;
(2) FIRSTPOINT INSURANCE AGENCY,
INC.; and
(3) THE INSURANCE CENTER
AGENCY, INC.,

          Defendants.

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

**MAR 19 2025**

Case No. _____ **RICK WARREN**
**COURT CLERK**
108_____

# CJ-2025-1860

## PETITION

    COME NOW the Plaintiffs, Mid-Del Group Home, Inc. and Joel Bain (collectively, "Plaintiffs"), and for their causes of action against Defendants Philadelphia Indemnity Insurance Company ("Philadelphia Indemnity"), FirstPoint Insurance Agency, Inc. ("FirstPoint"), and The Insurance Center Agency, Inc. ("Insurance Center") (collectively "Defendants"), hereby allege and state as follows:

### JURISDICTION AND VENUE

    1.    Plaintiff Mid-Del Group Home, Inc. is a domestic non-profit corporation organized and existing under the laws of the State of Oklahoma.

    2.    Plaintiff Joel Bain is a citizen of the State of Oklahoma and a resident of Oklahoma County, Oklahoma. Joel Bain is the Executive Director of Mid-Del Group Home, Inc.

    3.    Defendant Philadelphia Indemnity Insurance Company is a foreign insurer that is licensed and engaged in the business of insurance in the State of Oklahoma. Philadelphia Indemnity is a subsidiary of and/or operated under the umbrella of Philadelphia Insurance

**EXHIBIT**
**5**

Companies, a national insurer headquartered in Bala Cynwyd, Pennsylvania. Philadelphia Indemnity may be served via the Oklahoma Insurance Commissioner, Glen Mulready, 400 N.E. 50th Street, Oklahoma City, OK 73105.

4.       Defendant FirstPoint Insurance Agency, Inc. is a domestic for-profit corporation organized and existing under the laws of the State of Oklahoma and doing business in Midwest City and Oklahoma County. FirstPoint may be served through its registered agent, Robert H. Croak, at 2911 S. Air Depot Blvd., Midwest City, OK 73110.

5.       The Insurance Center Agency, Inc. ("Insurance Center") is a domestic for-profit corporation organized and existing under the laws of the State of Oklahoma and doing business in Oklahoma City, Midwest City, and Norman—Oklahoma and Cleveland Counties. Insurance Center may be served through its registered agent, Ronald G. Campbell, at 5600 N. May Ave., Ste. 300, Oklahoma City, OK 73120. Upon information and belief, Insurance Center owns and/or operates an insurance agency for and/or in association with Defendant FirstPoint. Further, FirstPoint is listed on Insurance Center's website as one of its locations.[1] As such, FirstPoint and Insurance Center are hereinafter collectively referred to as ("FirstPoint").

6.       FirstPoint sells property and casualty insurance policies, including commercial property policies, as an independent insurance agency. FirstPoint was the insurance agent that sold Plaintiffs the subject Policy at issue in this case.

7.       Insurance agents are properly joined defendants to this action. *See, e.g.*, *Norman v. State Farm*, 2025 WL 342871 (W.D. Okla. Jan. 30, 2025) (Russell, D.J.); *Oliver v. State Farm*, Remand Order ECF No. 12, CIV-24-789-SLP (W.D. Okla. February 11, 2025) (Palk, D.J.); *Bartholomew v. State Farm Fire & Cas. Co.*, 2022 WL 22879674 (W.D. Okla. Dec. 16, 2022)

---

[1] https://ticokc.com/contact/549 (last visited March 18, 2025).

(Jones, D.J.); *Nelson v. State Farm Fire & Cas. Co.*, 647 F. Supp. 3d 1189 (W.D. Okla. 2022) (DeGiusti, C.D.J.); *McDow v. State Farm Fire & Cas. Co.*, 2022 WL 17960457 (W.D. Okla. Dec. 27, 2022) (Friot, D.J.); *Ervin v. Herb Weaver Ins. Agency, Inc.*, 2022 WL 22839581 (W.D. Okla. Dec. 28, 2022) (Palk, D.J.); *Kyger v. State Farm Fire & Cas. Co.*, 649 F. Supp. 3d 1200 (W.D. Okla. 2022) (DeGiusti, C.D.J.); *Sexton v. State Farm Fire & Cas. Co.*, 2023 WL 11917022 (W.D. Okla. Jan. 5, 2023) (Jones, D.J.); *Phillips v. State Farm Fire & Cas. Co.*, 2023 WL 336142 (W.D. Okla. Jan. 20, 2023) (DeGiusti, C.D.J); *Christy v. State Farm Fire & Cas. Co.*, 2023 WL 2933312 (W.D. Okla. Apr. 13, 2023) (Russell, D.J.); *Shira v. State Farm Fire & Cas. Co.*, 2023 WL 4624701 (W.D. Okla. July 19, 2023) (Russell, D.J.); *Whitby v. State Farm Fire & Cas. Co.*, 2023 WL 11763365 (N.D. Okla. Aug. 21, 2023) (Frizzell, D.J.); *Stacy v. State Farm Fire & Cas. Co.*, 2023 WL 11915451 (W.D. Okla. Dec. 29, 2023) (Wyrick, D.J.); *Champion v. State Farm Fire & Cas. Co.*, 2023 WL 11944492 (W.D. Okla. Dec. 29, 2023) (Wyrick, D.J.); *Ross v. State Farm Fire & Cas. Co.*, 2024 WL 1092540 (W.D. Okla. Mar. 13, 2024) (Dishman, D.J.); *Jessop v. State Farm Fire & Cas. Co.*, 2024 WL 3400543 (E.D. Okla. July 12, 2024) (Melgren, D.J.); *Stayton v. State Farm Fire & Cas. Co.*, (N.D. Okla. April 20, 2023) (Kern, D.J.); *Killingsworth v. State Farm Fire & Cas. Co.*, (N.D. Okla. April 21, 2023) (Kern, D.J.); *Bean v. State Farm Fire & Cas. Co.*, (N.D. Okla. June 26, 2024) (Cartwright, D.J.); *Martin v. Allstate Vehicle & Prop., Ins. Co.*, No. CIV-23-739-SLP, 2024 WL 3510301 (W.D. Okla. July 23, 2024) (Palk, D.J.); *Wedin v. Allstate Vehicle & Prop., Ins. Co.*, 2023 WL 6806995 (N.D. Okla. Oct. 16, 2023) (Eagan, D.J.). As FirstPoint and Insurance Center are both citizens of the forum-state, removal of this action by any Defendant would be improper, unreasonable, and frivolous under 28 U.S.C. § 1447.

8.    Venue is proper pursuant to 12 O.S. § 137.

## FACTUAL BACKGROUND

9.    Plaintiffs own commercial property that operates group homes which provide: "a comprehensive network of vocational and residential services to individuals with developmental disabilities and their families in Oklahoma since 1983. The goals of Mid-del group home are to enhance independence, encourage integration, and promote respect for individual rights. We are set apart by loving concern, staff competence, and mutually beneficial relationships."[2] Plaintiffs' commercial properties at issue in this case are located at the following: (1) 620 Hedge Dr., Midwest City, OK 73110 ("**Hedge**"); (2) 711 Small Oak, Midwest City, OK 73110 ("**Small Oak**"); (3) 608 N. Midwest Blvd., Midwest City, OK 73110 ("**Midwest**"); (4) 1540 Republic Cir., Midwest City, OK 73110 ("**Republic**"); and (5) 314 N. King Ave., Midwest City, OK 73130 ("**King**") (collectively, the "Insured Properties"). Plaintiffs' Insured Properties house twenty-four residents in the Midwest City area.

10.    FirstPoint represents and markets itself as an independent insurance agency that is friendly, experienced, and can get affordable insurance tailored to clients' specific needs:

---

[2] https://www.mdgh.org/ (last visited March 13, 2025).

Friendly Customer Service
Our dedicated staff of insurance professionals is known for its friendly service and positive attitude

We are an Independent Insurance Agency
We work for you, not the insurance company

Our staff can be your liaison with the insurance company in the event of a claim.

We are a neighborhood insurance agency. Close by when you need us

Experience
Our staff has 60 years of experience in the insurance industry

We make finding affordable insurance easy. We shop the market for the provider with the lowest price to fit your needs. Do you know if you are saving the maximum amount possible on your current insurance policy? We can review it for you to find out Contact Us and we will do our best to start saving you money today

Get affordable insurance that will fit your unique needs.
Make the latest changes to your policy directly from our website twenty-four hours a day, seven days a week. Use any of our convenient forms for policy service directly from your home or office. As an independent insurance agent serving Midwest City, Del City, Moore, Choctaw and Oklahoma City, Oklahoma we can offer the right coverage with a personal touch you would expect from your neighborhood insurance agent

3

11.    With respect to commercial property insurance, FirstPoint represents that it "can assist [customers] in finding the commercial property insurance policy that best suits the needs of [their] business. Call us today at **405-869-2330** with any questions or concerns or to start the process of finding ***comprehensive coverage*** for [customers'] business."[4] Additionally, FirstPoint states the following with respect to the commercial property insurance coverage it can procure:[5]



Commercial Property Insurance Information

**What is commercial property insurance?**

Businesses have many physical assets, including buildings, computers, specialized equipment, outdoor signage and inventory. If a fire, storm or thief were to damage or steal these assets, a business may have to go through a recovery process before their doors can open once more.

Without adequate commercial property coverage, approximately a quarter of businesses fail during the first year following a disaster or theft. Such events result in hundreds of billions of dollars in paid claims. Most businesses cannot afford such a substantial loss. Commercial property insurance can assist with repairs, replacements and lost income during a tumultuous time like a natural disaster or theft. A Oklahoma commercial property insurance policy would also cover equipment, computers, tools and furniture.

**How does commercial property insurance help?**

Commercial property insurance helps businesses survive various situations. These situations include the following:
- **Repair or replacement:** Coverage can extend to assets that are lost, damaged or stolen due to fire, storm, hail, tornado, theft or vandalism. Damage from flooding and earthquakes are excluded.
- **Lost income:** Income loss results from a business' inability to run as usual following a disaster. This coverage can offer lost income relief, along with the expenses associated with recovery.
- **Temporary location:** A devastated building may no longer be able to support daily operations. Coverage can extend to funding a temporary location while repairs are being made.

---

[3] https://www.firstpointinsurance.com/ (last visited March 17, 2025).
[4] https://www.firstpointinsurance.com/commercial_property/default.aspx (last visited March 17, 2025).
[5] *See* Note 3.

12.     In this regard, FirstPoint advised Plaintiffs that the Insured Properties met all underwriting requirements and that any risk assessment was performed to meet Plaintiffs' specific commercial property insurance needs.  At no time did FirstPoint inform Plaintiffs as to any inspection of the Insured Properties and/or any concerns or issues with the installation/faulty workmanship of the Insured Properties' roofs or any pre-existing damage that would alter or negate full replacement cost coverage for the roofs on the Insured Properties. Thereafter, FirstPoint sold Plaintiffs a commercial lines policy through Philadelphia Indemnity.

13.     Defendant Philadelphia Indemnity insures the Insured Properties owned by Plaintiffs pursuant to a Replacement Cost Commercial Lines Policy No. PHPK2582426-003 (the "Policy").   Under the Policy, Plaintiffs secured the following Policy Limits for its Insured Properties with Blanket Building Coverage in excess of $4million and specifically as follows:

Deductible: 2% of the building limit per building

| Location - Building | Building Limit | Wind/Hail Deductible 2% |
|---|---|---|
| 1-1: 1540 Republic Cir Midwest City, OK 73110 | $1,537,500.00 | $30,750.00 |
| 2-1: 620 Hedge Dr Midwest City, OK 73110 | $705,000.00 | $14,100.00 |
| 4-1: 711 Small Oaks Midwest City, OK 73110 | $705,000.00 | $14,100.00 |
| 5-1: 608 N Midwest Blvd Midwest City, OK 73110 | $705,000.00 | $14,100.00 |
| 6-1: 314 N King Ave Midwest City, OK 73130 | $494,000.00 | $9,880.00 |

14.     Throughout the life of the Policy, Plaintiffs have faithfully paid premiums for its coverage through Philadelphia Indemnity.

15.     Despite FirstPoint's representations and promises made (either through inherent representations or by omissions) regarding FirstPoint's ability to procure a commercial lines policy that would provide "***comprehensive coverage***" and protect Plaintiffs' Insured Properties from Oklahoma severe weather losses, such as tornadoes, wind, and hailstorms, the Policy procured by FirstPoint through Philadelphia Indemnity did not provide the full replacement cost coverage that

Plaintiffs requested and understood they had received.

16.    On or about May 19, 2024, the Insured Properties were severely damaged by a powerful wind and hailstorm that impacted numerous homes and properties in the Midwest City area. As a result of this storm, each of the Insured Properties sustained comprehensive and widespread wind and hail damage to the roof, including large hail impacts all over the roof shingles, soft metals, gutters, downspouts, etc. The extensive damage to the Insured Properties was well-documented, with detailed estimates/reports and quality photographs showing the overwhelming amount of hail impacts identified and marked by chalk on each roof for the Insured Properties.

17.    On or about July 19, 2024, Plaintiffs timely reported the claim for the storm damage to Philadelphia Indemnity and were assigned Claim No. 1661330 (the "Claim"). Although Philadelphia Indemnity lists the date of loss as June 25, 2024, both Plaintiffs' engineer and the engineering company hired by Philadelphia Indemnity rely on the same storm date of May 19, 2024 in their reports for the Claim.

18.    On July 22, 2024, Jason Babey, a property claim specialist with Philadelphia Insurance Companies, emailed Plaintiffs to inform them Philadelphia Indemnity had received the Claim and it was being assigned to an independent third-party adjuster—Adam Porter with Engle Martin. In addition to instructions for the Claim process, Mr. Babey informed Plaintiffs that "[m]y goal is to help you through the claim process and ***_get your business back to pre-loss condition_*** in accordance with your policy provisions and conditions." Unfortunately, this express coverage representation made by Mr. Babey turned out to be false.

19.    Philadelphia Indemnity attempted to shirk its duties owed to Plaintiffs (including but not limited to evaluating the Claim in good faith and in a full, fair, thorough and timely manner)

by deploying Adam Porter with Engle Martin to investigate the Claim. However, Plaintiffs believe that Engle Martin is one of Philadelphia Indemnity's "hired-gun" third-party adjusting companies that engage in biased claims handling on behalf of Philadelphia Indemnity in order to support denials in its favor. Thus, Engle Martin stands to benefit financially from handling claims like that of Plaintiffs in bad faith. Here, Plaintiffs allege that Engle Martin was dispatched to rubber-stamp a denial on behalf of Philadelphia Indemnity.

20.    On July 23, 2024, Adam Porter informed Plaintiffs by letter that Engle Martin Inc. had been retained by Philadelphia Indemnity and confirmed that his inspection of the Insured Properties would take place on July 25, 2024.

21.    Subsequently, Plaintiffs hired multiple reputable roofing contractors to assess the damage to the Insured Properties. Plaintiffs' roofing contractors marked extensive hail damage with chalk all over the Insured Properties' roofs, took a wealth of high-quality photographs of the damage, and prepared estimates of the severe wind and hail damage to the Insured Properties. Plaintiffs' roofing contractors advised Plaintiffs that each of the Insured Properties required full roof replacements and provided estimates for the damage in the following amounts: (1) over $39,000 for **Hedge**; (2) over $40,000 for **Small Oak**; (3) over $40,000 for **Midwest**; (4) over $12,000 for **Republic**; and (5) over $58,000 for **King**.

22.    On July 25, 2024, Adam Porter inspected each of the Insured Properties and instead of evaluating the full extent of the wind and hail damage, Adam Porter intentionally ignored blatant wind and hail damage and manipulated each of his estimates to ensure that very little damage was found and that Plaintiffs would receive far below their full replacement cost benefits rightfully owed pursuant to the Policy. Contrary to the widespread damage Plaintiffs' roofing contractors had observed, Adam Porter limited his damage findings in the estimates to the following low-ball

8

amounts: (1) $354.81 for **Hedge**; (2) $29,585.42 for **Small Oak**; (3) $29,585.42 for **Midwest**; (4) $1,467.47 for **Republic**; and (5) $1,076.60 for **King**.

23.    Mr. Porter's inspection of the Insured Properties was woefully inadequate and his estimates were intentionally manufactured to ensure that the damage to 3 Insured Properties (**Republic**, **Hedge**, and **King**) fell below their Policy deductibles, while the other 2 Insured Properties (**Small Oak** and **Midwest**) were limited to damages far below the actual cost necessary to afford Plaintiffs their full replacement cost benefits rightfully owed under the Policy.

24.    As noted in an August 30, 2024 letter from Engle Martin, Porter based his manipulated estimate off of Forensic Engineering Company, LLC's ("FEC") findings.

25.    In addition to Engle Martin, Philadelphia Indemnity had also deployed a third-party engineering company, FEC, to assess the damage to the Insured Properties. FEC is another biased third-party company hired by Philadelphia Indemnity to rubber stamp and approve a denial on its behalf. Again, the hiring of a third-party engineer is a bad faith tactic by Philadelphia Indemnity aimed at disguising its own bad faith claims handling and attempting to shift its good faith and fair dealing duties on others. Here, Philadelphia Indemnity deployed these third-party companies (Engle Martin and FEC) to cover Philadelphia Indemnity under a false cloak of impartiality even though their actual goal was to support a denial on Philadelphia Indemnity's behalf.

26.    FEC inspected the Insured Properties on August 9, 2024 and submitted its damage findings to Philadelphia Indemnity for review. Engle Martin prepared and submitted its estimate, through Adam Porter, based on FEC's findings.

27.    On August 22, 2024, Mr. Babey provided Plaintiffs the engineering report from FEC, summarized FEC's findings, and informed Plaintiffs that 2 Insured Properties (**Small Oak** and **Midwest**) had hail damage to the roof and would be worked up by Adam Porter as full roof

replacements—which turned out to be untrue based on his sham and low-ball findings. Mr. Babey also advised that "[t]he rest of roof coverings did not show evidence of hail damage. There are various soft metal components such as metal vents that showed signs of hail indentions. Wind damage was observed 608 N Midwest Blvd and 620 Hedge Dr."

28.    Mr. Babey's summary of FEC's Report and damage findings clearly evidences a *deny everything mentality* that was carried out by Philadelphia Indemnity through the use of its "hired gun" and biased third-party companies. Therefore, the investigation of Plaintiffs' Claim was egregiously pre-textual and purely outcome oriented. The following conclusions by FEC on Philadelphia Indemnity's behalf indicate as much:

- "*Hail occurred at and in proximity of the properties on May 19, 2024*."

  - Plaintiffs note that this is a different date of loss than Philadelphia Indemnity notes in all other Claim correspondence—June 25, 2024. Additionally, Plaintiffs' engineer provided reports identifying hail sizes of 1.5 inches and over at the Insured Properties' locations on May 19, 2024.

- "Spatter marks indicate the specific locations of recent hail impact and *are not considered distress as defined in this report*."

- "Circular/elliptical shaped indentations in light-gauge aluminum and steel components are consistent with hail impact. *These indentations do not affect the functionality or service life of the affected components and are categorized as cosmetic distress*."

- "The PVC roof membrane at the 1540 Republic Cir building *did not experience hail-related distress as defined in this report*."

- "Hail potentially displaced individual granules from shingles at the 711 Small Oaks and 608 N Midwest Blvd properties *but the individual missing granules will not affect the function of the shingle nor reduce the service life*."

- "Recent wind caused the following *distress*:
  - Displacement of a hip shingle section at the 608 N Midwest Blvd building.
  - Detachment of soffit panel along the north side of a porch at the 620 Hedge Dr building."

  29.    Here, every admission of damage sustained is followed by some type of

excuse/coverage limitation/misattribution of damage to non-covered causes of loss (*i.e.*, distress, cosmetic distress, hail-related distress, function of the shingle, reduce the service life, etc.) that enabled Philadelphia Indemnity to avoid paying Plaintiffs their full replacement cost benefits. These limitations and/or internal damage definitions were weaponized against Plaintiffs to support a denial—a stark contrast to returning the Insured Properties to their "***pre-loss condition***" promised by Mr. Babey on Philadelphia Indemnity's behalf at the opening of the Claim. *See* ¶ 18, *supra*.

30.     Plaintiffs were unaware that these coverage limitations and damage definitions would operate to negate their full replacement cost coverage upon the filing of the Claim.

31.     Additionally, Mr. Babey's summary of the FEC report further noted "[o]ther observed conditions were not due to recent wind or hail." Once again, the following misattribution of wind and hail damage to pre-existing damage/non-covered causes of loss allowed Philadelphia Indemnity to ignore obvious wind and hail damage and avoid paying for full replacement:

-   "deformed gutter section was ***due to incidental impact by vehicles backing up to the door***."

-   Tear in the outer lens of a skylight was "***due to incidental impact during installation***."

-   Scuffs, impressions, and cuts/splits to PVC membrane were "***due to incidental contact***."

-   Circular-shaped punctures to roof membrane/shingles at **Republic** and **Hedge**, as well as shingle curling at **Small Oak** were all attributed to ***withdrawn nails***. A bullet was purportedly found embedded in the shingles at **Midwest**; thus, puncture in the shingles at Midwest was attributed to ***bullet impact***.

-   Shingle scuffs/abrasions on NE roof slope of **Hedge**; West roof slope of **Small Oak**; and South roof slope of **Midwest** were attributed to ***long-term tree rub***. For the missing shingle sections to these roof slopes, it was noted that "[f]ibers were exposed along the torn shingle edges, indicating that the ***shingles had been torn long enough for the asphaltic material to deteriorate, revealing the underlying fibers***."

-   For the outer pane of a window on the southeast elevation of **Hedge**, the cracking and missing glass, despite admitting was consistent with impact, was attributed to ***incidental impact and not to impact by wind-borne debris*** because there was ***no "evidence of other wind-borne related distress at [Hedge]***."

11

- For rubber rain collars that were displaced and torn/punctured at **Midwest**, it was stated that "[o]ne of the *torn sections was deflected upwards/away from the roof indicating pressure applied from below the rain collars inconsistent with impact by hail or by wind-borne debris* and therefore not related to recent weather events." Thus, the displaced and torn/punctured rubber rain collars were attributed to *rodent activity*.

32.    The pre-existing damage noted in FEC's report and Mr. Babey's summary (*i.e.*, incidental impact during installation, withdrawn nails, long-term tree rub, deterioration, etc.) are the type of pre-existing damage/conditions that would have affected Plaintiffs' Insured Properties' eligibility for coverage both at Policy inception and upon each subsequent annual renewal of coverage. Thus, both FirstPoint and Philadelphia Indemnity were required to verify the condition of the Insured Properties prior to the Claim and disclose to Plaintiffs any issues with the condition or other defects that would negate Plaintiffs' full replacement cost coverage. Instead, FirstPoint and Philadelphia Indemnity failed to verify the condition of the Insured Properties, never reported any pre-existing damage or other defects to Plaintiffs, and then weaponized pre-existing damage and other non-covered causes of loss against Plaintiffs in the form of a denial on the Claim.

33.    The excuses, pre-existing damage, and non-covered causes of loss further noted allowed Philadelphia Indemnity to disregard wind and hail damage through the use of Engle Martin and FEC, its hired-gun companies.

34.    FEC and Engle Martin manufactured sham reports, estimates and damage findings on Philadelphia Indemnity's behalf in order to support a denial and help it avoid providing Plaintiffs their full replacement cost benefits pursuant to the Policy.

35.    Both FEC and Engle Martin helped Philadelphia Indemnity completely walk-back its coverage representation that it would assist Plaintiffs in returning their business "*back to pre-loss condition.*" *See* ¶ 18, *supra.*

36.    FEC and Engle Martin were hired by Philadelphia Indemnity with a pre-determined

goal of denying the Claim as opposed to conducting a full, fair, thorough and timely investigation in accordance with Philadelphia Indemnity's duty of good faith and fair dealing.

37.    Philadelphia Indemnity, through Engle Martin and FEC, intentionally ignored blatant wind and hail damage warranting full roof replacements at the Insured Properties, which was clear from the wealth of evidence provided by Plaintiffs' roofing contractors.

38.    On September 5, 2024, Mr. Babey emailed Plaintiffs informing them that payment by Philadelphia Indemnity in the amount of $30,970.84 was issued for the damage to **Small Oak** and **Midwest**. Strangely, Mr. Porter had estimated the exact same amount of damage for both the **Small Oak** and **Midwest** properties.

39.    The low-ball amount paid by Philadelphia Indemnity is nowhere near the full replacement cost benefits Plaintiffs are rightfully owed for ***all*** Insured Properties pursuant to the Policy and does not return their business "***back to pre-loss condition***" as promised by Jason Babey. *See* ¶ 18, *supra*. As such, Philadelphia Indemnity denied the Claim for the five Insured Properties at issue.

40.    Mr. Babey falsely informed Plaintiffs that **Small Oak** and **Midwest** would be worked up as full roof replacements because Philadelphia Indemnity instead issued this low-ball Claim payment (which was based on Engle Martin and FEC's low-ball and manipulated estimates) that was not enough to cover full roof replacements. *See* ¶ 27, *supra*.

41.    On September 9, 2024, Philadelphia Indemnity issued a letter to Plaintiffs explaining its denial of the claims for **Republic**, **Hedge** and **King**, as well as low-ball payment and denial of the claims for **Small Oak** and **Midwest**. In this letter, Philadelphia Indemnity explained its heavy reliance on Engle Martin (Adam Porter) and FEC (Payden Johnson) and their inspections/damage findings. Due to Engle Martin's and FEC's sham reports and pre-textual

13

findings that it relied on, Philadelphia Indemnity based its denial on "wear and tear, faulty or inadequate workmanship, and nesting or infestation of rodents."

42.    Again, the pre-existing damage/conditions noted should have been discovered and disclosed to Plaintiffs by FirstPoint and Philadelphia Indemnity. Instead, FirstPoint and Philadelphia Indemnity insured the Insured Properties recklessly and blindly by inherent representations or omissions in that the Insured Properties were eligible and qualified for full replacement cost coverage. The pre-existing damage/conditions Philadelphia Indemnity relied on negated full replacement cost coverage, but this was never fully communicated or disclosed to Plaintiffs.

43.    On September 9, 2024, Plaintiffs (through Mr. Bain) responded to Philadelphia Indemnity's denial letter and informed it that Plaintiffs disagreed with the findings. Mr. Babey advised Plaintiffs they could retain their own engineer and Philadelphia Indemnity would review that report once available. Additionally, FirstPoint informed Plaintiffs it would give a call to discuss Plaintiffs' options.

44.    FirstPoint also assisted Plaintiffs with the Claim. For example, on September 23, 2024, Plaintiffs inquired as to whether or not Plaintiffs should hold onto their Claim payment from Philadelphia Indemnity or deposit it since Plaintiffs are disputing the amount. FirstPoint responded by advising Plaintiffs they could deposit the check because Philadelphia Indemnity acknowledged Plaintiffs were in dispute and seeking further claim assistance from an engineer.

45.    Since then, Plaintiffs have engaged their own licensed and reputable engineer who confirmed that due to the severe wind and hail damage, all of the Insured Properties roofs had been totaled and required full replacements as Plaintiffs are rightfully entitled to under the Policy.

46.    Plaintiffs' engineer's reports, extensive photographs, and damage findings

14

completely thwart and disprove Engle Martin's and FEC's sham and falsified findings. Plaintiffs' engineer identified overwhelming hail impacts marked by chalk, as well as substantial wind damage, that covered the Insured Properties' roofs. Moreover, Plaintiffs' engineer provided reports identifying hail sizes of 1.5 inches and over at the Insured Properties' locations on the May 19, 2024 date of loss.

47.     In addition to denying the Claim, Philadelphia Indemnity increased Plaintiffs' Policy premiums by 26%, causing additional harm to Plaintiffs.

48.     Without their full replacement cost benefits rightfully owed under the Policy, Plaintiffs cannot guarantee the safety of their residents because of Philadelphia Indemnity's refusal to restore the Insured Properties to their pre-loss condition. Philadelphia Indemnity has left Plaintiffs' non-profit business with storm-damaged roofs (thereby threatening the safety, security, and peace of mind of Plaintiffs and their residents) and additional damage to the Insured Properties continues to accrue as more severe weather passes through Oklahoma.

49.     For example, on March 14, 2025, all of Oklahoma (including Plaintiffs' Insured Properties) was devastated by the approx. 70-80mph winds that pummeled roofs everywhere and caused more than 130 wildfires that burned about 170,000 acres. Because Philadelphia Indemnity left Plaintiffs' properties in such bad shape by refusing to afford the policy benefits rightfully owed, the recent devastation has significantly magnified Plaintiffs' dire situation.

## COUNT I: BREACH OF CONTRACT
### *Against Defendant Philadelphia Indemnity*

50.     All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

51.     Plaintiffs entered into a contract of insurance with Philadelphia Indemnity to provide coverage for the Insured Properties located at: (1) 620 Hedge Dr., Midwest City, OK

15

73110; (2) 711 Small Oak, Midwest City, OK 73110; (3) 608 N. Midwest Blvd., Midwest City,

OK 73110; (4) 1540 Republic Cir., Midwest City, OK 73110; and (5) 314 N. King Ave., Midwest

City, OK 73130.  The Policy was in full force and effect at all material times hereto.

      52.      Plaintiffs provided proper and timely notice to Philadelphia Indemnity of its claim

arising from a wind and hailstorm that occurred on or about May 19, 2024, which caused

significant damage to the Insured Properties.

      53.      Plaintiffs complied in all material ways with the terms and conditions of the

Policy.

      54.      Philadelphia Indemnity breached its contractual obligations under the terms and

conditions of the Policy by failing to pay Plaintiffs all benefits owed under the terms and conditions

of the Policy and for wrongfully underpaying and denying portions of the Claim.

      55.      As a result of Philadelphia Indemnity's breach of contract and other wrongful

conduct, Plaintiffs incurred damages.

## COUNT II: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### ("Bad Faith")
### *Against Defendant Philadelphia Indemnity*

      56.      All allegations in the preceding paragraphs of this Petition are fully incorporated as

if each were fully set forth herein.

      57.      At all relevant times hereto, Philadelphia Indemnity owed Plaintiffs a duty of good

faith and fair dealing.

      58.      Philadelphia Indemnity knowingly, intentionally, purposefully, wrongfully, and

repeatedly breached its duty to deal fairly and in good faith by engaging in the following acts and

omissions:

          a.      Failing to perform a proper investigation regarding Plaintiffs' Claim made

pursuant to the Policy, including but not limited to a fair and objective investigation of Plaintiffs' damages sustained;

      b.     Unreasonably using and relying on a hired-gun adjusting company and engineer to support its refusal to pay for full roof replacements;

      c.     Failing to pay Plaintiffs the full and fair amount for the property damage sustained to Plaintiffs' Insured Properties in accordance with the terms and conditions of the Policy;

      d.     Knowingly engaging in a pattern and practice of denial-oriented investigations and claims-handling practices;

      e.     Purposefully engaging in arbitrary and capricious claims handling practices;

      f.     Denying and or underpaying indemnity payments owed to its first-party insureds on valid property damage claims that require full roof replacements;

      g.     Withholding pertinent benefits, coverages, and other provisions due to Plaintiffs under the terms and conditions of the Policy in violation of the Unfair Claims Settlement Practices Act, 36 O.S. §§1250.1-1250.16;

      h.     Limiting and/or denying rights inherent to Plaintiffs;

      i.     Recklessly disregarding said rights;

      j.     Forcing Plaintiffs to retain counsel to recover insurance benefits owed under the terms and conditions of the Policy;

      k.     Knowingly and purposely failing to inspect the Insured Properties prior to inception of the coverage and/or maintain current information as to the condition of the Insured Properties prior to the loss;

l.      Failing to notify Plaintiffs both prior to and at the inception and renewal of the Policy, of any pre-existing damage and other conditions that, if a claim were made, would limit coverage;

m.      Failing to communicate all coverages and benefits, as well as coverage negating defects, applicable to the Claim;

n.      Failing to perform a proper, timely, fair, and objective investigation of the Claim;

o.      Failing to pay the full and fair amount for the wind and hail damage sustained to the Insured Properties in accordance with the Policy's terms and conditions;

p.      Failing to base its denial of the Claim on valid, accurate, and reasonable grounds;

q.      Failing to disclose Philadelphia Indemnity's lack of compliance with its own underwriting guidelines, policies, and procedures in denying coverage to Plaintiffs;

r.      Engaging in the pattern and practice of denying full roof replacement claims by asserting pre-existing damages and faulty installation without a pre-inception property inspection and/or without reasonably updated knowledge of the pre-loss condition of the subject property; and

s.      Engaging in the pattern and practice of utilizing third-party hired-gun adjusting companies (like Engle Martin) and engineers (like FEC) to support underpaying and denying claims.

59.     The conduct of Philadelphia Indemnity, as described above, constitutes bad faith and is a material breach of the terms and conditions of the Policy and its underlying insurance contract between the parties. Philadelphia Indemnity had no reasonable basis in its refusal to

18

recognize and pay Plaintiffs the full amount of benefits owed pursuant to the Policy for the wind and hail damage to the Insured Properties.

60.    As a consequence of Philadelphia Indemnity's breach of the duty of good faith and fair dealing, Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering that naturally results from an insurance failure in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interests.

61.    Philadelphia Indemnity's conduct was intentional, willful, malicious, and/or in reckless disregard of the rights of others. Philadelphia Indemnity's actions during the handling of Plaintiffs' Claim demonstrate it acted intentionally, and with malice (without justification or excuse) and breached its duty to deal fairly and in good faith. Philadelphia Indemnity's actions were consistent with an overall collective corporate goal of increasing profits through the systematic underpayment and denial of claims and is sufficiently egregious in nature so as to warrant the imposition of punitive damages. Philadelphia Indemnity's conduct demonstrates a "pattern" theory of bad-faith conduct, liability for which is cognizable under Oklahoma law. *See* 12 Okla. Stat. § 2406; *Vining v. Enter. Fin. Group*, 148 F.3d 1206, 1218 (10th Cir. 1998) (where plaintiff sought to prove insured's pattern and practice of bad faith conduct, evidence regarding other insureds was relevant to show defendant "acted in this case under Federal Rule of Evidence 406 (habit)"); *see also Metzger v. Am. Fid. Assur. Co.*, 2007 WL 4342082, at *1 (W.D. Okla. Dec. 7, 2007); *Markham v. National States Ins. Co.*, 122 Fed. Appx. 392 (10th Cir. 2004) (evidence of nation-wide rescission practice supported bad faith); *Barnes v. Okla. Farm Bur. Mut. Ins. Co.*, 2000 OK 55, 11 P.3d 162, 170 ("*insurer's unreasonable treatment of Barnes was not an isolated incident, but the same or similar tactic was used by insurer repeatedly with other insureds*";

awarding actual and punitive damages); *Copeland v. Tela Corp.*, 2003 OK CIV APP 98, ¶ 3, 79

P.3d 1128 (confirming no abuse of discretion in allowing evidence of habit evidence under 12 O.S.

§ 2406 to show pattern and practice conduct.); *Jones v. Farmers Ins. Co., Inc.,* 2012 WL 12863976

(W.D. Okla) (court holds that similar claims are relevant to Plaintiff's contract claim and the claim

of bad faith in that they may show a pattern and practice).

62.    Philadelphia Indemnity enjoyed increased financial benefits and ill-gotten gains as

a direct result of the wrongful conduct described above herein, which resulted in the injury to

Plaintiffs.

## COUNT III: NEGLIGENT PROCUREMENT OF INSURANCE
### *Against FirstPoint*

63.    All allegations in the preceding paragraphs of this Petition are fully incorporated as

if each were fully set forth herein.

64.    FirstPoint solicits and markets itself as an independent insurance agency that works

for the customer, not the insurance company, and can "[g]et affordable insurance that will fit

[Plaintiffs'] unique needs,"[6] including what they tout as a replacement cost commercial property

insurance coverage to prospective insureds that "can assist with repairs, replacements and lost

income during a tumultuous time like a natural disaster or theft[]" because "[m]ost businesses

cannot afford such a substantial loss."[7] Philadelphia Indemnity uses a form insurance policy to

issue property coverage in Oklahoma—while the amount of coverage (and premiums charged

therefor) differ from insured to insured, the scope of coverage is in large part materially the same

for all insureds.

---

[6] https://www.firstpointinsurance.com/ (last visited March 17, 2025).

[7] https://www.firstpointinsurance.com/commercial_property/default.aspx (last visited March 17, 2025).

65.     Although FirstPoint markets itself as an "independent insurance agency", FirstPoint plays a crucial role in the sale, binding, and renewal of the Philadelphia Indemnity commercial property insurance policy to the insured. This role creates key legal duties, which FirstPoint and Philadelphia Indemnity owes to the insured:[8]

a.    FirstPoint must use reasonable care, skill, and diligence to procure coverage as the insured requested that meets the insured's stated needs;

b.    FirstPoint agents who undertake the calculation of replacement cost for the insured must use reasonable care, skill, and diligence to do so; and

c.    When FirstPoint speaks, it owes a duty to do so accurately and truthfully.

66.     FirstPoint has a duty to speak and to fully disclose all material information to an insured about Philadelphia Indemnity's bad faith claims handling tactics, its reliance on biased hired-gun adjusters and engineers, its pattern and practice to avoid paying for full roof replacements, and other material information any insured would deem reasonable in making a purchasing decision.

67.     Industry standards, as well as FirstPoint's legal duty of reasonable skill, care, and diligence in the procurement of insurance, require FirstPoint to act in accordance with the training and contractual requirements Philadelphia Indemnity imposes upon them. These requirements and training exist to ensure policyholders receive the coverage they request and FirstPoint binds

---

[8] Under Oklahoma law, a duty to speak may arise from a partial disclosure. *Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp.*, 24 F.3d 1190, 1195 (10th Cir. 1994) (the law imposes a duty to speak from a partial disclosure because "the speaker is under a duty to say nothing or to tell the whole truth" (citation and internal quotation marks omitted)); *Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350,1353-54 (Okla. 1988) ("Although a party may keep absolute silence and violate no rule of equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to disclose the whole truth."); *see also Ervin v. Herb Weaver Ins. Agency, Inc.*, 2022 WL 22839581 (W.D. Okla. Dec. 28, 2022) (Palk, D.J.).

coverage in accordance with its representations to the insured and Philadelphia Indemnity's internal guidelines.

68.    FirstPoint should meet these duties by inter alia performing an in-person inspection of the Insured Properties prior to the inception of coverage and routinely thereafter to verify the condition and attributes of the Insured Properties for the purposes of (a) the agent's accurate calculation of replacement cost and (b) the agent's accurate representation that the Insured Properties qualify for coverage under Philadelphia Indemnity's guidelines. Indeed, not all properties automatically qualify for Philadelphia Indemnity commercial property policies—only those which meet its internal guidelines and thus constitute a good risk for Philadelphia Indemnity to insure.

69.    The policy is a contract—one that obligates Philadelphia Indemnity to indemnify its insured upon the occurrence of a covered loss. Philadelphia Indemnity's issuance of an insurance policy to an insured contains certain critical representations: namely, that the property identified in the policy declarations meets the criteria for the coverage prescribed at the time of inception or renewal.[9] FirstPoint further expressly and/or inherently represents that no condition, pre-existing damage, deterioration, wear-and-tear, or other defect negates the property's eligibility for full coverage under the policy.

70.    FirstPoint should inspect the Insured Properties to determine their eligibility for coverage under Philadelphia Indemnity's internal underwrite ng requirements. There is no other way for FirstPoint to gather the information it needs to accurately relay to Philadelphia Indemnity (and the insured) whether the property rightfully meets the criteria for coverage.

---

[9] This must be true, for the issuance of coverage upon a property that does not qualify at the time would constitute an illusory coverage violation.

71.    FirstPoint represented expressly and/or impliedly to both Philadelphia Indemnity and the insured that the Insured Properties meet certain criteria and are eligible for coverage. This representation is repeated each time the policy renews, such that FirstPoint represents the Insured Properties' eligibility (and, thereby, the absence of any condition that would negate that eligibility), each policy year upon renewal.

72.    In the event FirstPoint finds the property fails to quality for replacement cost coverage (*e.g.*, the roof is too old, too worn, in poor condition, was improperly installed, or otherwise affected by pre-existing conditions), FirstPoint owes an independent duty to report the same to both the insured and to Philadelphia Indemnity. This should result in reduction, denial, or cancellation of coverage. Of course, this determination would first require a physical inspection of the Insured Properties' roofs.

73.    Ultimately, FirstPoint binds coverage for the property on behalf of Philadelphia Indemnity. Philadelphia Indemnity then issues a resultant commercial property insurance policy only when all binding criteria are met. Upon information and belief, FirstPoint did not perform or acquire an in-person inspection of the Insured Properties and their roofs to be insured at the inception and/or renewal of the Policy. This means FirstPoint represents the Insured Properties' eligibility to both Philadelphia Indemnity and the insured recklessly and blindly, without ever verifying whether that representation is true.

74.    Plaintiffs contacted FirstPoint to procure full replacement cost commercial insurance coverage from Philadelphia Indemnity for Plaintiffs, as Plaintiffs requested and according to their specific and unique needs. FirstPoint confirmed it had obtained a replacement cost policy that would provide coverage for the Insured Properties in the event of a loss.

75.    To that end, Plaintiffs expressly and/or inherently disclosed concerns and insurance

23

needs to FirstPoint. Above all, given Oklahoma's extreme weather, FirstPoint is aware that the Plaintiffs need coverage under a policy that would fully replace the Insured Properties' roofs in the event of a loss, without exclusion of any weather-related losses.

76.     By virtue of the act of procuring the Policy and binding coverage (without limitation), FirstPoint independently established, calculated, and set the Policy's replacement cost value and resultant policy coverage limits. Neither FirstPoint nor Philadelphia Indemnity required or otherwise asked Plaintiffs to calculate or request a specific amount of coverage for the Insured Properties. Instead, FirstPoint insured the Insured Properties to 100% of their alleged replacement cost value, as FirstPoint determined utilizing valuation software and information from FirstPoint's purported inspection.

77.     By virtue of the act of procuring the Policy and binding coverage (without limitation), FirstPoint independently selected and calculated coverage and expressly and/or inherently conveyed that such coverage limit was accurate, correct, commensurate with actual reconstruction costs, and represented 100% of the Insured Properties' insurance to value.

78.     Here, FirstPoint committed the following strategic and material omissions:

    a.  Neither FirstPoint nor Philadelphia Indemnity ever inspected the roofs on the Insured Properties or procured such an inspection from a third party.

    b.  Neither FirstPoint nor Philadelphia Indemnity ever verified the Insured Properties' condition, characteristics, attributes, etc.—whether at Policy inception or upon each subsequent annual renewal of the Policy.

    c.  Neither FirstPoint nor Philadelphia Indemnity ever disclosed to Plaintiffs that the Insured Properties were ineligible for the requested replacement cost coverage for any reason.

24

d.  Neither FirstPoint nor Philadelphia Indemnity ever advised Plaintiffs that the Insured Properties' roofs had any defect, pre-existing damage, faulty installation or other conditions that would exclude them from replacement cost coverage.[10]

e.  Neither FirstPoint nor Philadelphia Indemnity ever advised Plaintiffs of any condition that would exclude the Insured Properties' roofs from full replacement cost coverage.

f.  Neither FirstPoint nor Philadelphia Indemnity ever advised Plaintiffs of Philadelphia Indemnity's internal coverage limitations and clandestine definitions of "hail damage," "faulty or inadequate installation/workmanship," "functional damage," "distress," "cosmetic distress," "hail-related distress," etc. with respect to the roofs at Plaintiff' Insured Properties. Instead, FirstPoint by virtue of the act of procuring the Policy and binding coverage (without limitation), acts to ensure coverage for the Plaintiffs under the Policy for all fortuitous losses and that all weather-related damages—be it big or small, functional or cosmetic—regardless of the severity, nature or type was covered.

g.  Neither FirstPoint nor Philadelphia Indemnity required or otherwise asked Plaintiffs to calculate or request a specific amount of coverage for the Insured Properties.

h.  Neither FirstPoint nor Philadelphia Indemnity disclosed to Plaintiffs that the value FirstPoint calculated for the Insured Properties and resultant coverage limits did not in fact represent 100% insurance to value.

---

[10] As explained above, had FirstPoint identified any such condition, FirstPoint would have been required to report the same to both Plaintiffs and Philadelphia Indemnity.

    i.   Nevertheless, and under the cover of FirstPoint's strategic and material omissions, FirstPoint procured and Philadelphia Indemnity issued the Policy.

79.    In procuring the Policy, FirstPoint had a duty to:

    a.  use reasonable care, skill, and diligence to procure coverage as the insured requested that meets the insured's stated needs;

    b.  use reasonable care, skill, and diligence in undertaking the calculation of replacement cost for the insured;

    c.  speak accurately and truthfully by informing Plaintiffs of all coverages, advising Plaintiffs of the benefits, risks, limitations and exclusions thereof, and perform a reasonable inspection of the Insured Properties prior to procuring the replacement cost coverage and thereafter upon renewal to ensure no changes to the Policy were necessary or required; and

    d.  disclose all material facts with respect to Philadelphia Indemnity's claim handling outlined within this Petition.

80.    FirstPoint breached its duty owed to Plaintiffs by knowingly and purposefully procuring and renewing:

    a.  illusory coverage (in that all fortuitous losses are not covered under the Policy);

    b.  coverage deviating substantially and materially from that which Plaintiffs requested;

    c.  a Policy that did not accurately reflect the replacement cost of the Insured Properties (*i.e.*, an amount that was 100% insurance to value as represented);

   d. a Policy that, as written, did not provide coverage to fully restore the Insured Properties back to their pre-loss condition as promised by Jason Babey on Philadelphia Indemnity's behalf. *See* ¶ 18, *supra*;

81. FirstPoint further breached its duty owed to Plaintiffs by failing to:

   a. follow and abide by Philadelphia Indemnity's underwriting policies/guidelines;

   b. perform all necessary inspections of the Insured Properties;

   c. disclose pre-existing damage to the Insured Properties;

   d. verify whether its inherent representation to Philadelphia Indemnity and Plaintiffs that the Insured Properties (including their roofs) were in good condition was accurate;

   e. procure and renew a policy that provided the requested coverage for all fortuitous losses; and

   f. disclose all material facts as outlined within this Petition.

82. Plaintiffs relied on FirstPoint's representations and/or omissions to substantial detriment.

83. As a result of FirstPoint's conduct, Plaintiffs sustained damages, including deprivation of monies rightfully belonging to Plainitffs and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering.

84. FirstPoint's conduct was intentional, willful, malicious and in reckless disregard of the rights of others and is sufficiently egregious in nature so as to warrant the imposition of punitive damages. FirstPoint acted intentionally, and with malice and, breached duties owed to Plaintiffs. FirstPoint's actions were consistent with Philadelphia Indemnity's overall collective corporate goal of increasing profits through the systematic underpayment and denial of claims.

## COUNT IV: CONSTRUCTIVE FRAUD AND NEGLIGENT MISREPRESENTATION
### *Against All Defendants*

85.    All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

86.    Defendants owed a legal and/or equitable duty to disclose all material facts that may arise out of their relationship as insurer and insured. *Croslin v. Enerlex, Inc.*, 2013 OK 34, ¶ 17, 308 P.3d 1041.

87.    The concealment of a material fact which substantially affects another person constitutes fraud. *Patel v. OMH Medical Center, Inc*., 1999 OK 33, ¶ 34; *Sutton v. David Stanley Chevrolet*, 2020 OK 87, 475 P.3d 847. Fraudulent representations may consist of half-truths calculated to deceive, and a representation literally true is actionable if used to create an impression substantially false. *Sutton*, 475 P.3d at 15. Where the peculiar circumstances give rise to a duty on the part of one of the parties to a contract **to disclose material facts and the party remains silent to his or her benefit and to the other party's detriment**, the failure to speak constitutes fraud. *Id*. (citing *Croslin*, ¶ 17) (emphasis added).

88.    "[A] variety of facts and circumstances [] will give rise to a duty to disclose material facts." The *Sutton* Court reiterated that it has "consistently found the existence of the requisite circumstances, i.e., that which is necessary to create a duty to disclose, when the offending party created a false impression concerning material facts that was relied upon by the other party to his detriment and to the benefit of the offending party." *Id*. at 15.

89.    A negligent or innocent misrepresentation or concealment for constructive fraud occurs when one who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by

28

their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. Negligent misrepresentation can also be based on a material omission. *See Lopez v. Rollins*, 2013 OK CIV APP 43, 303 P.3d 911; *Sutton v. David Stanley Chevrolet*, 2020 OK 87; *Stroud v. Arthur Andersen & Co.*, 2001 OK 76, 37 P.3d 783; *Ragland v. Shattuck Nat'l Bank*, 36 F.3d 983, 992 (10th Cir. 1994) (applying Oklahoma law).

90.    Defendants owed specific duties to the Plaintiffs.  These duties are encompassed in Philadelphia Indemnity's duty of good faith and fair dealing owed to its insureds, as well as specific duties  owed by FirstPoint to Plaintiffs—a duty to exercise reasonable diligence and skill in obtaining and accurately notifying of the nature and character of the insurance procured, the duty in undertaking the calculation of replacement cost for the insured to use reasonable care, skill, and diligence to do so, the duty to speak accurately and truthfully, and the duty to disclose all material facts relating to the Policy as outlined within this Petition.

91.    Defendants breached this duty by misrepresenting, concealing, or omitting pertinent material facts from Plaintiffs, including (but not limited to) the following:

a.    Defendants misrepresented the Insured Properties met all underwriting requirements, that all property inspections had occurred, and that the replacement cost values it calculated were accurate and commensurate with reconstruction costs such that the coverage would fully restore, replace and/or repair the Insured Properties (including their roofs) in the event of a loss by a covered event;

b.    Defendants misrepresented that the Insured Properties (and, specifically, their roofs) were eligible for the comprehensive[11] full replacement coverage (rather than ACV);

---

[11] *See e.g.* ¶ 11, *supra.*

c.  Defendants failed to disclose that pre-existing issues with the Insured Properties would either prevent issuance of the replacement cost coverage or limit coverage for any damage during the Policy period;

d.  FirstPoint misrepresented the procurement of the comprehensive coverage Plaintiffs requested;

e.  Defendants misrepresented that the Policy covered all fortuitous losses and that weather-related damage (even cosmetic)—big or small—was fully covered under the Policy;

f.  Defendants failed to disclose all material information to an insured about Philadelphia Indemnity's bad faith claims handling tactics, its reliance on undisclosed definitions and standards outside of the Policy, its pattern and practice of utilizing third-party hired guns to further its scheme/bad faith pattern and practice of intentionally avoiding full roof replacements on weather related roof claims, and other material information any insured would deem reasonable in making a purchasing decision; and

g.  Defendants failed to disclose to Plaintiffs any of the above misrepresentations and/or omissions, any facts underlying these misrepresentations, or any material facts regarding this scheme/bad faith pattern and practices.

92.  Nevertheless, Defendants sold and renewed illusory replacement cost insurance coverage to Plaintiffs knowing such statements were untrue.

93.  As a result of both Defendants' breaches of duties, each gained an advantage by misleading Plaintiffs to substantial detriment and prejudice. These breaches of duties induced Plaintiffs to accept, purchase, and renew the Philadelphia Indemnity replacement cost policy.

94.  Defendants' conduct constitutes constructive fraud.

95.    As a result of the Defendants' constructive fraud, Plaintiffs sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering.

96.    Defendants' conduct was intentional, willful, malicious, and in reckless disregard of the rights of others, and/or was grossly negligent, and is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, this Court should enter judgment on behalf of Plaintiffs against all Defendants for:

(a)    Actual damages in an amount in excess of $75,000.00;

(b)    Punitive damages under Oklahoma law;

(c)    Disgorgement of the increased financial benefits derived by any and/or all of the Defendants as a direct result of the Defendants' wrongful conduct; and

(d)    Prejudgment interest, costs, and attorneys' fees.

31

Respectfully submitted,

*Blake Sonne*

Reggie N. Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
Blake Sonne, OBA No. 20341
Hannah Whitten, OBA No. 35261
John S. Sanders, OBA No. 34990
Jake Denne, OBA No. 35097
**WHITTEN BURRAGE**
512 North Broadway Avenue, Suite 300
Oklahoma City, OK 73102
Office:        405.516.7800
Facsimile:    405.516.7859
rwhitten@whittenburragelaw.com
mburrage@whittenburragelaw.com
bsonne@whittenburragelaw.com
hwhitten@whittenburragelaw.com
jsanders@whittenburragelaw.com
jdenne@whittenburragelaw.com
**ATTORNEYS FOR PLAINTIFFS**

**ATTORNEYS' LIEN CLAIMED**
**JURY TRIAL DEMANDED**