**Examining the Insurance Industry's Claims Practices Following Recent Natural Disasters**

**Testimony of Jacob Vertel**

**May 13, 2025**

Chairman Hawley, Ranking Member Kim, and Members of the Subcommittee, thank you for the opportunity to testify today. Early on the morning of September 27, my family was awoken by a tree crashing through our roof. My wife and in-laws, who were in town visiting at the time, rushed into our toddler's room to make sure he was unharmed. The storm was still raging, so we moved my pregnant wife and child to the floor next to our kitchen island in our single-story ranch home, where we felt it was safest. Before we lost power, I was able to file a claim with State Farm. At that moment, I didn't realize just how severe the storm was—I was simply focused on figuring out where my family would stay that evening. While on the call, we abruptly lost power and cell service. For the next several hours, we sought cover as a total of four trees fell on our home and water poured through half the house.

Once the storm subsided, all five of us camped together for three days in what we assumed to be the safest section of the home. With my wife's pregnancy being high-risk, it was critical that she had access to medical care, and our two-year-old son needed a safe environment. The moment I could, I evacuated my family to my in-laws' home in Ohio. With them safe, I returned to North Carolina to begin the insurance process and to find a place for us to stay once water was restored to the area.

Our first inspection with State Farm was on October 7, ten days after the storm. The inspection seemed to go well enough. While on-site, I spoke to the inspector about the ample additional living expense coverage included in our policy. You can imagine my dismay when I received a voicemail the next day walking back the information he shared, instead stating that our home was being considered habitable by State Farm—a home where I watched water pour through the outlets, where the sky is visible from our two-year-old's bedroom, our nursery-to-be, our living room, and our bathroom. At that time, cell service in Asheville was still limited, so my wife, from Ohio, was trying to speak with State Farm. The few times I managed to get on the phone with her, she gave me agonizing updates about the undue stress being put on her as the basic

**EXHIBIT 1**

commitments of our policy were already being aggressively denied. It became clear we needed support and did not have the capacity to take this on ourselves, so we hired a public adjuster.

Not long after, our decision to hire a public adjuster was reaffirmed when we received our first estimate of the damage from State Farm. The sum we were to receive would not even cover fixing the roof, let alone repairing our entire home. From there, we watched as our case was handled with little communication from State Farm. Emails went unanswered for weeks at a time. We were told that State Farm had issued a payment on our claim on October 24. That check did not show up.

One month after the storm, I moved my family back to Asheville into a rental home at our own expense. From this new home base, we spent months driving across town, trying to protect our house from further damage—draining tarps, resecuring them, setting rodent traps, and doing all we could to prevent pipes from bursting. Covered only by tarps, our home struggled to retain heat during the mountain winter. During this period, Buncombe County placed a placard on our home, stating the property was "not safe to occupy or enter."

After three months of no movement, we were hopeful things would finally start progressing when State Farm assigned a new adjuster to our case. The damage payment that was supposedly issued in October was reissued in December. However, we quickly lost hope again when it became evident that we were starting over from scratch having to provide all claim information again. It was as if all information from the previous three months was lost. All the while, State Farm communication remained scarce. Re-inspections were discussed, then no one would show up. In the little communication we did receive, it became clear that this new adjuster was not qualified to speak on general home construction and repair. We repeatedly reaffirmed the need for critical repairs, only to be met with the adjuster's opinion: "I don't think that is necessary." He dismissed formal inspections conducted by contractors and mitigation specialists. The broken trusses struggling to hold up our roof simply were not a matter of opinion.

After 123 days of our home sitting untouched, and relentless communication on our end, a reinspection was finally scheduled. During this inspection, as we stood staring at our gutted home, State Farm's adjuster admitted that their initial estimate was too low and said he would be re-filing 'for the policy limit.' Even so, an hour later, we stood in front of the county's unsafe structure notice as he told my now eight-month-pregnant wife that separate living

accommodations for our family were not required and that the county notice, which we had provided at least half a dozen times, did not matter in the eyes of State Farm. Despite dismissing the need for coverage, this adjuster then admitted he was unfamiliar with our specific policy, instead citing a policy that did not apply to us. He went on to say that he would 'see what he could do' about covering additional living expenses now that it was winter.

After dealing with State Farm for five months, it was no surprise that when a revised estimate of the damages came through in February, only minuscule adjustments were made. Expenses we had already covered personally, and for which we had provided State Farm with invoices, were short-paid. Again, we found ourselves needing to continue covering expenses out-of-pocket while still being unable to fix our home.

At that point, we sought legal assistance and were ultimately forced to file a suit against State Farm. After 157 days, only after we took legal action, the structural engineer we had been requesting for months was finally sent by State Farm. Now, 228 days after the storm, our home remains untouched, with no progress being made. My wife, who was three months pregnant at the time of the storm, gave birth to our daughter two and a half months ago. Our son turned three in April. What could have been just a blip in his childhood has become a major event in his life as he repeatedly asks to "go back home."  We need State Farm to give us our life back.

Thank you for hearing our experience.