My name is Douglas Quinn. I am the Executive Director of the American Policyholder Association. We are a non-profit watchdog group that monitors, identifies, and reports on insurer fraud against property owners.

The APA was started after Superstorm Sandy when many survivors were further victimized on our insurance claims. The storm flooded my home. I was at my weakest moment. Instead of helping me, my insurance company hired an engineering firm named U.S. Forensics. U.S. Forensics created a report that an independent engineer determined was false, and my insurer denied me coverage for the worst damage to my home. Despite being fully insured, it took me 7 years of fighting to get back home and at 61 years old, the experience counts as one of the most traumatizing betrayals of my life.

It wasn't just MY home, many families were similarly victimized in what we now refer to as the "Sandy Engineering Fraud Scandal". CBS News, 60 Minutes, and PBS Frontline documentaries reported on this scandal in which nearly half a billion dollars was wrongfully denied to policyholders by companies actively diverting funds from victims. A claims executive from one of the insurers plead the 5th amendment when asked if his company participated in defrauding policyholders. This scandal had a devastating impact on thousands of families who had dutifully paid insurance premiums as a safety net only to be betrayed in the claims process. For many, it was the end of the American dream as they lost their homes altogether.

Superstorm Sandy wasn't the first time insurers defrauded policyholders, and it will not be the last. Year after year and disaster after disaster, the APA receives reports of insurer fraud. Like me, many times the insurer will hire an engineering company to inspect the property. An engineer will visit the property, inspect it, and write an engineering report, only to have someone else manipulate the report to reach a predetermined outcome. Insurers are shielded by plausible deniability that it is an engineering company, not them, committing the fraud. But insurers are the ones truly driving it. They continue to use U.S. Forensics and other known fraudsters year after year and decade after decade.

And its not just engineering reports. Insurers play the same shell game with adjusters. Most adjusters that homeowners interact with aren't actually employed by the insurance company; they're employed by so-called "third-party administrators." Although technically a separate company from the insurer, these third-party administrators are simply alter egos of the insurance companies. And they commit the same fraud the engineers do. Trained adjusters will inspect a property and write an honest estimate, only to be instructed to alter and delete facts by a reviewer. This isn't an isolated incident or a few bad apples. Its systemic. Worse—it's industry wide. It has been for decades. It happened in Katrina. It happened in Sandy. It happened in Irma. It's happening now.

I worked in the insurance industry for 30 years, and I know that there are thousands of dedicated, hard-working professionals who take pride in helping these families recover after a loss. Many of those professionals would be appalled to find out the full scope of what happens to many policyholders in the claims process.

Many are aware of the fraud, but they are afraid of speaking out. They have good cause to be concerned. In this regard, insurers are like gangsters. Employees who speak out are blacklisted, harassed, and sued. After Katrina in 2005, two State Farm employees blew the whistle on State Farm's plan to shift financial

EXHIBIT 2

responsibility for damage from State Farm to the National Flood Insurance Program using systemic engineering fraud. State Farm sued the sisters to silence them. But after the federal government chased State Farm through over a decade of litigation, State Farm agreed to pay $100 million to settle the claim. More recently, a young insurance adjuster named Jordan Lee reported that a TPA he adjusted hurricane Ian claims for had altered and fabricated adjustment reports. The company that hired the TPA, Heritage Insurance, is now suing Jordan for defamation even though he did not accuse Heritage of changing his reports, but rather the company in their employ. However, Florida's Office of Insurance Regulation recently levied an historic $1 million dollar fine against Heritage for multiple violations in regard to handling of hurricane Ian claims. Jordan's a kid. He doesn't have any money. Many suspect that they're suing Jordan not for money, but to silence he and other whistleblowers. There are those who assert that the insurance industry's playbook is; break the law and ruin the whistleblower. I routinely speak to insurance insiders who are terrified of retaliation. If it wasn't for whistleblowers like Jordan, journalists like the Washington Post's Briana Sacks, and honest plaintiff's lawyers like Stephen Bush, the public would never even hear about the fraud allegations. In fact, all too often, they don't.

Virtually industry-wide, insurance companies are committing fraud and ruining the lives of the very people who have paid them premiums for protection. Even as they pay skyrocketing premiums, American's receive less and less in claims. The American consumer is being squeezed.

But this fraud is about far more than money. Americans buy insurance so they can sleep well knowing they are protected in their weakest moment. When their homes are flooded and their condos burned, and they are scrambling to find alternative housing for their families and new schools for their children, the last thing people want is to go to war with their insurance company. The stress of needing to do so destroys marriages and spoils childhoods.

The fraud also affects the federal government. When their insurance company underpays or denies their valid claims, homeowners are forced to rely on FEMA and federal aid packages. The American taxpayer is subsidizing the fraud.

Much of this would not be possible if fraudsters in the insurance markets were held accountable for their actions. But many states have proven incapable of doing so. My organization has given gift-wrapped fraud cases to state authorities only to have those reports sit on a shelf, or languish without results. It's time for federal enforcement. It's time for federal prosecutions. It's time for these criminal organizations to be brought to justice.

To this panel I would say: The American public needs you. Thank you.